1  Robert A. Sacks (SBN 150146)
   sacksr@sullcrom.com
2  Brian R. England (SBN 211335)
   englandb@sullcrom.com
3  Edward E. Johnson (SBN 241065)
   johnsonee@sullcrom.com
4  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
5  Los Angeles, California 90067-1725
   Tel.:   (310) 712-6600
6  Fax:   (310) 712-8800

7  Frank L. Bernstein (SBN 189504)
   fbernstein@kenyon.com
8  KENYON & KENYON LLP
   1801 Page Mill Road, Suite 210
9  Palo Alto, California 94304-1216
   Tel.:   (650) 384-4700
10 Fax:   (650) 384-4701

11 *Attorneys for Plaintiffs j2 Global, Inc. and*
   *Advanced Messaging Technologies, Inc.*

12

13                    **UNITED STATES DISTRICT COURT**

14                    **CENTRAL DISTRICT OF CALIFORNIA**

15

16 ADVANCED MESSAGING                 )  Case No. CV 11-4239 DDP (AJWx)
   TECHNOLOGIES, INC. AND j2          )
17 GLOBAL, INC.,                      )  **PLAINTIFFS j2 GLOBAL, INC.**
                                      )  **AND ADVANCED MESSAGING**
18                       Plaintiffs,  )  **TECHNOLOGIES, INC.'S REPLY**
                                      )  **IN SUPPORT OF MOTION TO**
19             v.                     )  **DISQUALIFY PERKINS COIE**
                                      )  **LLP AND TO COMPEL**
20 EASYLINK SERVICES                  )  **DISCOVERY**
   INTERNATIONAL                      )
21 CORPORATION,                       )
                                      )  Judge:       Hon. Dean D. Pregerson
22                       Defendant.   )  Courtroom: 3
                                      )  Date:        November 19, 2012
23                                    )  Time:        10:00 a.m.
                                      )
24                                    )
                                      )  Fact Discovery Cutoff: Dec. 21, 2012
25                                    )  Pretrial Conference:     Aug. 26, 2013
                                      )  Trial Date:              Sept. 17, 2013
26                                    )

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 5

I.   California Law Governs. .................................................................................... 6

II.  California Law Requires Disqualification. ....................................................... 7

     A.     This Case Is Substantially Related to Findley's Representation of j2. ...................................................................................................... 7

     B.     Findley's Conflict Is Imputed to Perkins Coie. ................................. 10

     C.     California's Rule Is Well-Founded. .................................................... 14

III. Disqualification Is Warranted Even if California Law Is Disregarded ......... 16

     A.     Open Text Knew About Findley's Conflict ....................................... 16

     B.     There Is a Significant Risk that j2 Will Be Prejudiced if Perkins Coie Is Not Disqualified. ................................................... 17

     C.     Defendants' Authority Is Inapposite. ................................................. 22

     D.     Disqualification Is the Only Equitable Outcome. .............................. 23

CONCLUSION ............................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*In re Airport Rental Antitrust Litigation*,
    470 F. Supp. 495 (N.D. Cal. 1970)..............................................................10, 22

*In re American Airlines, Inc.*,
    972 F.2d 605 (5th Cir. 1992) ............................................................................14

*Beltran* v. *Avon Products, Inc.*,
    2012 WL 2108667 (C.D. Cal. June 1, 2012).................................................22, 23

*Canatella* v. *Krieg, Keller, Sloan, Reilley & Roman*,
    2012 WL 847493 (N.D. Cal. Mar. 13, 2012) ....................................... 10-11, 22

*Cole Asia Business Center, Inc.* v. *Manning*,
    2012 U.S. Dist. LEXIS 155589 (C.D. Cal. October 30, 2012) ..........................6

*In re County of Los Angeles*,
    223 F.3d 990 (9th Cir. 2000) .......................................................................6, 10

*Kevlik* v. *Goldstein*,
    724 F.2d 844, 849 (1st Cir. 1984) ....................................................................14

*Legacy Villas at La Quinta Homeowners Ass'n* v. *Centex Homes*,
    2012 WL 1536036 (C.D. Cal. Apr. 30, 2012)....................................................6

*Openwave Systems, Inc.* v. *724 Solutions, Inc.*,
    2010 WL 1687825 (N.D. Cal. Apr. 22, 2010) ................................................6, 7

*Oracle America, Inc.* v. *Innovative Technology Distributors, LLC*,
    2011 WL 2940313 (N.D. Cal. July 20, 2011) ..............................................10, 22

*State of Arkansas* v. *Dean Food Products, Co.*,
    605 F.2d 380 (8th Cir. 1979) ............................................................................14

*U.S.* v. *Miller*,
    624 F.2d 1198 (3d Cir. 1980) ...........................................................................14

-ii-

**STATE CASES**

*Cho* v. *Superior Court*
   39 Cal. App. 4th 113 (1995) ...................................................................... 25

*City National Bank* v. *Adams*
   96 Cal. App. 4th 315 (2002) ...................................................................... 15

*Flatt* v. *Super. Ct.*
   9 Cal. 4th 275 (1994) ...................................................................... 1, 11, 12

*Global Van Lines, Inc.* v. *Super. Ct.*
   144 Cal. App. 3d 483 (1983) ................................................................. 7, 15

*H.F. Ahmanson & Co.* v. *Salomon Bros., Inc.*
   229 Cal. App. 3d 1445 (1991) ...................................................... 14-15, 18

*Henriksen* v. *Great Am. Sav. & Loan*
   11 Cal. App. 4th 109 (1992) .......................................................................... 7

*Jessen* v. *Hartford Casualty Ins. Co.*
   111 Cal. App. 4th 698 (1999) ........................................................................ 8

*Kirk* v. *First American Title Insurance Co.*
   183 Cal. App. 4th 776 (2010) ....................................................... 11, 12, 15

*Pound* v. *DeMera DeMera Cameron*
   135 Cal. App. 4th 70 (2005) ............................................................. passim

*Rosenfeld Construction Co.* v. *Superior Court*
   235 Cal. App. 3d 566 (1991) ...................................................................... 25

*Zarco Supply Co.* v. *Bonnell,*
   658 So. 2d 151 (Fla. Dist. Ct. App. 1995) ............................................... 14

**OTHER AUTHORITIES**

Cal. Bar Ethics Op. 1998-152 ............................................................. 13, 24-25

Cal. Rule of Ct. 8.1125(c) .......................................................................... 11

Flamm, Lawyer Disqualification ................................................................. 14

-iii-

**<u>INTRODUCTION</u>**

Clyde Findley violated his ethical obligations to j2 by advising Open Text in its litigation against j2 after previously representing j2 in litigation concerning the same patents and invalidity issues.  Findley was substantially involved in those matters while he was at Kenyon & Kenyon and, as Defendants' Opposition makes clear, he has had substantial involvement in this litigation for more than eight months on Open Text's behalf, communicating extensively with internal counsel at Open Text and with external counsel at Perkins Coie.  From the Opposition, we now also know that Open Text's senior legal counsel knew about a potential conflict, but failed to do anything about it—a clear instance of willful blindness or worse and contrary to what Open Text's counsel told the Court at the conference on October 24.

Although Perkins Coie and Open Text's senior internal lawyers try to remove themselves from the effect of Findley's ethical breach by offering self-serving proclamations that Findley did not reveal any confidential information to them (in disregard of the Court's instruction that they not submit such declarations), that is not the legal test under California law, nor should it be. Under California law:  (i) an attorney who represents a client on a matter is conclusively presumed to have obtained confidential information about the matter; (ii) that attorney is absolutely precluded from representing anyone adverse to the client on a "substantially related" matter absent a waiver; (iii) if the attorney does so, the attorney must be disqualified without further inquiry; (iv) the mandatory disqualification extends to the disqualified attorney's entire firm (*Flatt*); and (v) the disqualification extends to other lawyers with whom the conflicted lawyer consulted about the matter, even if they are not in the same firm (*Pound*).

California imposes this objective test—regardless of fault and without inquiry into the actual communications—to protect the client whose rights have been violated, in this case j2, and to avoid the privilege waiver on the part of the

-1-

1   second client, in this case Open Text, that would be required if inquiry into the

2   substance of communications with the conflicted lawyer were necessary or

3   relevant.  Not only does this bright line rule protect the integrity of the legal

4   profession and the public's confidence in it, but it is prophylactic in nature

5   precisely to protect j2 from the possibility of further injury resulting from

6   Findley's ethical breach by removing those with whom he was communicating

7   about this case, since the extent to which they have been compromised can never

8   truly be known.  Any other result would make the protection of j2 secondary to

9   inconvenience to Open Text, which would undermine the rule's prophylactic intent

10  and be unfair to j2.

11          Defendants' principal argument is that, although California law

12  requires disqualification in these circumstances regardless of whether the

13  disqualified attorney is at fault, Perkins Coie should not be disqualified because

14  this was all Findley's fault.  Defendants claim, as Perkins Coie argued to this Court

15  at the October 24 hearing, that (i) Open Text and Perkins Coie had no idea that

16  Findley had a conflict, and (ii) as soon as they found out they immediately severed

17  all ties to Findley.  While those arguments should not change the outcome, it turns

18  out that neither is true.  Open Text's Opposition includes a declaration from its

19  Vice President and General Counsel, Douglas Parker, in which he reveals that in

20  December 2011 Findley informed him:

21          many years ago, he [Findley] was employed as an
            associate at Kenyon & Kenyon and that, while there, he
22          had performed a public prior art search related to a Bobo
            patent.  He said that Crowell Moring was investigating
23          whether this past work presented any conflict of interest
            issues.
24
    (Parker Decl. ¶ 4.)
25
            Mr. Parker goes on to state that he "did not understand this to mean
26
    that Findley had worked for j2."  This statement is incredible, but if nothing else it
27
    reflects inexcusable willful blindness on Open Text's part.  As of December 2011,
28

-2-

1  Open Text had been litigating against j2, on a Bobo Patent,[1] with Kenyon &
2  Kenyon as counsel of record and appearing on pleadings and at depositions and
3  hearings, for more than three years.  Mr. Parker, an educated lawyer and the
4  General Counsel of a billion-dollar company involved in significant, complex
5  litigation and presumed to be aware of the rules regarding conflicts of interest
6  governing attorneys,[2] knew as of 2009 that (i) j2 owned a Bobo patent; (ii) j2 was
7  asserting that patent against Open Text; and (iii) Kenyon & Kenyon represented j2
8  in that litigation.  Yet he asks this Court to accept the implausible assertion that he
9  did not realize, upon learning that Findley had done work for Kenyon & Kenyon
10 on a Bobo Patent, that Findley might have represented j2.[3]

11         Worse still, Mr. Parker does not explain why, when alerted that his
12 attorney had a potential conflict of interest, he (i) asked no questions of Findley
13 about the nature of the conflict, even the most basic questions such as the identity
14 of the former client or what matter the conflict related to; (ii) permitted Findley to
15 continue advising Open Text before learning whether Crowell & Moring
16 determined that a conflict existed; (iii) accepted, again without question, Findley's
17 statement that Crowell & Moring had determined there was no conflict; and (iv)
18 never consulted with Mr. Carroll—on whom Open Text claims it relies extensively
19
20
21  _____

22  [1]    U.S. Patent No. 6,350,066, asserted in this action, was invented by Charles
       Bobo and is commonly referred to as one of the Bobo Patents.

23  [2]    Mr. Parker holds himself out as an expert on ethics.  In June 2012 he was a
24  presenter at a Perkins Coie seminar entitled "Ethical Considerations for the In-
       House Attorney."  (Johnson Decl. Ex. 16.)

25  [3]    Mr. Parker's professed ignorance on this point is further undercut because
26  Kenyon was counsel of record in the original lawsuit filed against Captaris.
       Moreover, members of Open Text's legal department have personally attended
27  multiple hearings and depositions in this matter, pre-dating Findley's December
       2011 disclosure, in which Kenyon lawyers directly participated, such as the 2010
28  *Markman* hearing where Mr. Davies attended on behalf of Open Text and Frank
       Bernstein addressed issues related to the Bobo Patents.  (Johnson Decl. Ex. 2.)

-3-

1   for "indispensable" advice on a wide range of issues (Davies Decl. ¶ 3) and who

2   was handling the j2 litigation involving a Bobo patent—about the conflict.

3           It is incredible given this failure to ask even a single question that

4   Open Text asks this Court to regard it as an innocent victim.  If its General Counsel

5   had made the most minimal inquiry and acted as he should have, we would not be

6   here today.  In any balancing, j2 should not be the party to bear the costs of Open

7   Text's willful and/or reckless failures.  If Open Text will be injured by the

8   disqualification of Perkins Coie and exclusion of tainted in-house counsel as it

9   asserts, it has only itself to blame.

10          At the October 24 hearing, the Court questioned Defendants' lawyer

11   from Perkins Coie about Open Text's knowledge of the conflict.  Instead of

12   acknowledging that Findley had told Open Text about a potential conflict, Mr.

13   Carroll obfuscated:

14          There was an assertion made that Open Text hired Mr.
          Findley to perform in this capacity with knowing intent

15          that he had previously done work for j2.  When I – when
          I disclosed this issue – my knowledge of it to the folks at

16          Open Text, they told me they were wholly unaware of it;
          that they didn't know of it.

17

18   (Johnson Decl. Ex. 1 at 31.)  Perkins Coie's assertion that Open Text was "*wholly*

19   *unaware*" of the conflict—apparently based on a semantic distinction between

20   knowledge that Findley worked for j2 and knowledge that he had a "potential"

21   conflict involving Kenyon and a Bobo patent—was at least misleading.

22          Defendants' claim that all contact with Findley ceased as soon as j2

23   raised the conflict in July 2012 is demonstrably false as well.  Findley traveled to

24   Atlanta, presumably at Open Text's instruction, *after* the Farber deposition—when

25   Open Text and Perkins Coie claim that all contact with Findley ceased—to meet

26   with the King & Spalding lawyers who at that time were handling the *EasyLink*

27   cases.  King & Spalding made a presentation to Findley, who was the only Open

28

-4-

REPLY IN SUPPORT OF MOTION TO DISQUALIFY PERKINS COIE

1   Text representative at the meeting.[4]  Further, as the joint defense agreement

2   between Open Text and EasyLink continued after that meeting, Perkins Coie

3   lawyers had further contact with the tainted King & Spalding lawyers (and as far as

4   we know continue to have contact with them even today).

5          Finally, what evidence Defendants do seek to introduce consists of

6   vague, self-serving declarations by Perkin Coie and Open Text lawyers, uniformly

7   denying that Findley disclosed any confidential information to them.  These

8   declarations omit the only relevant information—who did Findley speak to, when,

9   how often, and about what.  The self-serving denials are not relevant under

10  California's approach to conflicts under Rule 3-310(E), and absent a privilege

11  waiver by Open Text none of these declarations can be tested and therefore they

12  should be accorded no weight.

13                        **ARGUMENT**

14         Defendants argue that disqualification is an unwarranted and drastic

15  measure, relying on inapplicable federal law and self-serving declarations claiming

16  that Findley did not give Perkins Coie or Open Text any of j2's confidential

17  information.  But disqualification is governed by California law.  Under California

18  law, Defendants' various factual assertions are irrelevant—by working with an

19  attorney who previously represented j2 in substantially related matters, Perkins

20  Coie is presumed to have received j2's confidential information and therefore must

21  be disqualified.  Moreover, even if the governing law is disregarded, the facts of

22  this case—in particular, Open Text's newly-revealed knowledge of Findley's

23  conflict in December 2011 and decision to allow Findley to continue to participate

24  in this matter after learning of the conflict—warrant the disqualification of Perkins

25

26

27  [4]       Ms. Matthai also told the Court that all contact between Open Text and
    Findley was "cut off" immediately following the July disclosure that Findley had
28  previously represented j2.  (Johnson Decl. Ex. 1 at 48.)  Unfortunately, that is
    simply not true given this meeting between Findley and EasyLink's counsel.

-5-

1  Coie, and require a screen to prevent the two tainted members of Open Text's in-

2  house legal department from participating in this litigation as well.

3  **I.    CALIFORNIA LAW GOVERNS.**

4          Defendants admit that federal courts "look to the California rules and

5  decisions in deciding disqualification motions," but argue that disqualification is

6  "ultimately a matter of federal law." (Opp. at 12.)  That is simply wrong.

7  Disqualification motions in this Court are governed by California law, as required

8  by Local Rule, *see* Local Rule 83-3.1.2, and as recognized by a decision issued by

9  this Court in the last week.  *See Cole Asia Business Center, Inc.* v. *Manning*, 2012

10 U.S. Dist. LEXIS 155589, at *5 (C.D. Cal. Oct. 30, 2012) ("The Court applies state

11 law in determining matters of disqualification."); *see also In re County of Los*

12 *Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Legacy Villas at La Quinta*

13 *Homeowners Ass'n* v. *Centex Homes*, 2012 WL 1536036, at *4 (C.D. Cal. Apr. 30,

14 2012).  Even Justice Moreno's Declaration, improperly presuming to tell this Court

15 how to rule, acknowledges that California law governs, as do all of the Federal

16 cases that Defendants rely upon. (Moreno Declaration[5] at ¶ 19.)

17          The only authority Defendants cite in support of their assertion that

18 federal law governs is a footnote in a single District Court decision.  (Opp. at 13,

19 citing *Openwave Sys., Inc.* v. *724 Solutions, Inc.*, 2010 WL 1687825, at *5 n.6

20 (N.D. Cal. Apr. 22, 2010).  That footnote does not address choice of law for

21 disqualification motions.  It discusses whether the court should follow a California

22 Court of Appeal decision that may not reflect the California Supreme Court's view.

23 *See id.*  The *Openwave* Court unmistakably applied California law—not federal—

24 and criticized the law firm opposing the disqualification motion for doing precisely

25

26

27 [5]        Justice Moreno's Declaration purports to tell the Court what the law is, and
   therefore improperly invades the province of the Court.  j2 has submitted
28 objections to the Declaration concurrently with this Reply.

-6-

1  what Defendants are doing here:  ignoring California's strict conflict rules, and

2  arguing that j2 has not made a showing that California law does not require.

> Fish's opposition to the present motion acknowledges the
> existence of the substantial relationship test, but presents
> it as if it were a poor substitute for the showing that a party
> seeking disqualification ordinarily ought to be expected
> to make. Fish begins by repeatedly asserting in various
> ways that Openwave failed to show that material
> confidential information was actually obtained by Fish in
> the prior representation.  That may be so, but "it is well
> settled that actual possession of confidential information
> need not be proved to disqualify an attorney from
> representing the adversary of a former client in litigation
> against the former client."

*Id.* (quoting *Global Van Lines, Inc.* v. *Super. Ct.*, 144 Cal. App. 3d 483, 489 (1983)).

## II.  CALIFORNIA LAW REQUIRES DISQUALIFICATION.

Under California law, Findley is presumed to be in possession of material, confidential information from j2 because this case is substantially related to the cases he worked on at Kenyon & Kenyon.  Moreover, Perkins Coie is presumed to have received j2's confidential information from Findley because its client, Open Text, hired Findley and assigned him to work on this litigation, and because Perkins Coie associated with Findley in defending this action.  As such, Perkins Coie should be disqualified and the two internal Open Text lawyers who have been working with Findley should be walled off from further involvement.

### A.    This Case Is Substantially Related to Findley's Representation of j2.

Under California law, if an attorney accepts employment adverse to a former client, disqualification is mandatory if the former representation and the new representation are "substantially related."  *Henriksen* v. *Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 114 (1992).  This litigation concerns the same patents that were at issue in the *Venali* and *CallWave* cases that Findley was involved in on behalf of j2.  Thus the former and new representation concern many identical

-7-

1    issues, including claim construction, which is a precursor to consideration of

2    validity and enforceability of the same patents, and similar, or at least overlapping,

3    infringement and damages issues.  As just one example of the relatedness of this

4    case and the *Venali* case, Venali participated in the *Markman* process along with

5    Open Text and EasyLink, coordinating with the other defendants in proposing

6    terms for construction and participating in consolidated meet and confer

7    discussions with Perkins Coie, King & Spalding, and j2's counsel.

8            Defendants' Opposition actually affirms the similarity between this

9    case and other patent infringement actions involving j2.  Defendants argue that

10   they would be prejudiced if Perkins Coie were disqualified because Mr. Carroll has

11   "obtained invaluable insight regarding j2's patents, methods of operating, litigation

12   tactics and settlement strategies and histories" in the course of defending Protus IP

13   Solutions, Inc., Comodo Communications, Inc., Packetel, Inc. and Zilker Ventures

14   against infringement claims on the same patents at issue in this case and the *Venali*

15   and *CallWave* cases.  (Opp. at 4; Carroll Decl. ¶¶ 8-12.)  At the same time,

16   however, Defendants dismiss Findley's work on the same patents in the *Venali* and

17   *CallWave* cases.  Defendants cannot maintain that Mr. Carroll's involvement in

18   other cases concerning these patents made him "invaluable" to Open Text in this

19   case, but that Findley's involvement (including privileged discussions with j2's

20   counsel) is not even substantially related to his work on this case.

21           Defendants argue that this case nevertheless is not substantially

22   related to the *Venali* and *CallWave* cases for several reasons, all of which are

23   meritless.  *First*, Defendants argue that the "defendants, claims and evidence" are

24   different.  (Opp. at 22.)  That is factually incorrect, and is not the proper legal test.

25   *See, e.g.*, *Jessen* v. *Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 711-12

26   (1999) (cases are substantially related if their subjects can be linked in a "rational

27   manner," with "subjects" given "a broader definition than the discrete legal and

28   factual issues involved in the compared representations").  Further, many of the

-8-

1  claims are the same—for example, Open Text, Venali and CallWave all asserted

2  claims seeking declarations that the '066, '638 and '688 Patents are invalid.  And

3  much of the evidence is the same—for example, the file histories of the Patents-in-

4  Suit, the licensing history of the Patents-in-Suit, and documents concerning

5  Defendants' invalidity claims, such as documents related to David Farber's alleged

6  use of j2's early Internet fax service.

7          *Second*, Defendants argue that the Patents-in-Suit underwent re-

8  examination by the U.S. Patent & Trademark Office ("PTO") after Findley left

9  Kenyon.  (Opp. at 10, 22.)  But one of the Patents-in-Suit, the '688 Patent, emerged

10  from re-examination unchanged, and the changes in the other two patents were

11  modest.  They certainly did not break the rational link between the subject matter

12  of this case and the subject matter of the prior cases.  Importantly, there is

13  significant commonality in claim construction issues between the current case and

14  the prior cases.  For example, Venali moved for partial summary judgment on the

15  ground that the term "audio message" in the '638 Patent referred to voice messages

16  but not fax messages (Johnson Decl. Ex. 3): Open Text and EasyLink made

17  precisely the same argument in the *Markman* hearing here.  (Case No. 09-4150,

18  Dkt. No. 175, at 31-33.)  Importantly, while employed by Kenyon, Findley

19  participated in writing and editing j2's opposition to Venali's motion on this very

20  issue, thereby conclusively demonstrating his access to j2's confidential

21  information on an issue substantially related to the instant case.

22          *Third*, Defendants argue that their invalidity defenses center on their

23  own products, which Venali and CallWave did not assert.  (Opp. at 22.)  But

24  Defendants also assert that the Patents-in-Suit are invalid based on alleged prior

25  public use.  (Johnson Decl. Ex. 4 at 25-29, 49-55.)  Venali asserted invalidity on

26  the exact same basis.  (*Id*. Ex. 5 at 3-4.)

27

28

1    There is no credible argument that the two matters are not

2  substantially related under the applicable test, and Defendants' efforts to press the

3  point only highlight the overall lack of credibility in their Opposition.

4         **B.    Findley's Conflict Is Imputed to Perkins Coie.**

5         Because Findley worked with Perkins Coie on this litigation,

6  Findley's conflict requires Perkins Coie's disqualification.  *See Pound* v. *DeMera*

7  *DeMera Cameron*, 135 Cal. App. 4th 70, 73 (2005) (holding that the rule of

8  vicarious disqualification applies to attorneys that associate with, but are not in the

9  same firm as, the conflicted attorney).  Defendants seek to avoid *Pound's*

10  unavoidable conclusion by (i) suggesting that the Court should follow contrary

11  federal decisions instead; (ii) suggesting that *Pound* is not good law; and (iii)

12  attempting to factually distinguish *Pound*.  All of those efforts fail.

13         ***1.    Pound Is Controlling.***

14         Defendants cite three Federal cases that decline to automatically

15  disqualify co-counsel of conflicted attorneys, and argue that the Court should

16  follow those cases rather than *Pound*.  (Opp. at 13, 15-17.)  Disqualification is

17  warranted here even under the cases Defendants rely upon, as set forth in Part III

18  below.  But there is no need to reach that question because *Pound* is dispositive.

19  California law governs disqualification, so to the extent another district court

20  decision conflicts with California law, California law controls.  *In re County of Los*

21  *Angeles*, 223 F.3d at 995.  Moreover, the three conflicting decisions to which Open

22  Text points are easily distinguished.  *In re Airport Rental Antitrust Litigation*

23  predated *Pound* and therefore had no occasion to consider its holding.  470 F.

24  Supp. 495, 501-02 (N.D. Cal. 1970).  In both *Canatella* v. *Krieg, Keller, Sloan,*

25  *Reilley & Roman* and *Oracle America, Inc.* v. *Innovative Technology Distributors,*

26  *LLC*, the Courts appear to have been unaware of *Pound*.  *See* 2012 WL 847493

27  (N.D. Cal. Mar. 13, 2012); 2011 WL 2940313 (N.D. Cal. July 20, 2011).  Neither

28  decision mentions *Pound*, and *Canatella* incorrectly states that "there are no

-10-

California or Ninth Circuit cases directly on point" as to "the issue of disqualification of co-counsel." 2012 WL 847493, at *2. It is not surprising that these decisions overlooked *Pound*, because the parties failed to cite it in their briefs. (Johnson Decl. Exs. 6-11.) These courts did not have the opportunity to consider *Pound* and their decisions do not provide any basis to disregard it.

## 2. *Pound Is Good Law.*

Defendants argue that *Pound* was criticized by *Kirk* v. *First American Title Insurance Co.*, 183 Cal. App. 4th 776 (2010). (Opp. at 14; Moreno Decl. ¶ 36.[6]) Defendants' characterization of *Kirk* is misleading. *Kirk* did not address the holding of *Pound* upon which j2 relies, *i.e.*, that co-counsel to a tainted lawyer is automatically subject to vicarious disqualification. *Kirk* addressed vicarious disqualification *within* a firm in the context of ethical screens, and criticized *Pound* on a different point: "we disagree with *Pound* to the extent it sees no qualitative distinction between an attorney who had a brief preliminary meeting with counsel for the first client [as in *Pound*] and an attorney who was actively involved with the first client's representation." 183 Cal. App. 4th at 800 n.20. Here, of course, Findley was actively involved in j2's representation.

Defendants assert falsely that *Kirk* "criticiz[ed] the *Pound* Court's 'absolute rule of vicarious disqualification in California' as 'improper'" (Opp. at 14). The language Defendants quote from *Kirk* referred to a different case, *Flatt* v. *Super. Ct.*, 9 Cal. 4th 275 (1994). And the *Kirk* Court's disagreement with the "absolute rule of vicarious disqualification" stated in *Flatt* had nothing to do with imputing a conflict to co-counsel—it had to do with ethical screens. *Kirk* held that

---

[6]    Although Justice Moreno now criticizes *Pound*, the California Supreme Court denied a petition to review the decision while he sat on the Court. *See Pound* v. *Demera, Demera, Cameron*, 2006 Cal. LEXIS 3550 (Cal. Mar. 15, 2006). Justice Moreno did not dissent from that decision. Nor did the California Supreme Court act to de-publish *Pound*, which it has the ability to do in cases where it does not want to undertake review of a case, but feels uncomfortable with the case's articulation of California law. Cal. Rule of Ct. 8.1125(c).

-11-

1    "vicarious liability is the *general* rule," which can be rebutted with an ethical

2    screen.  183 Cal. App. 4th at 801.  As in *Pound*, here there was no ethical screen—

3    not only was Findley not screened, he actively assisted in the matter.  Therefore

4    j2's reliance on *Pound* is well-founded and Defendants' criticisms are not.

5                    **3.    *Pound Is Not Distinguishable.***

6                    Defendants next attempt to distinguish *Pound* on three grounds.

7    (Opp. at 14-15.)  *First*, Defendants argue that *Pound* was factually different

8    because the former representation and the new representation related to the same

9    lawsuit.  But in successive representation cases, there is no difference between a

10   lawyer appearing adverse to a former client in the same case or in a substantially

11   related case.  The test is "substantial relationship" and, either way, the lawyer's

12   access to material, confidential information is presumed.  *See Flatt* v. *Super. Ct.*, 9

13   Cal. 4th 275 (1994).  Whether the information came from the same case has no

14   bearing on *Pound's* holding that co-counsel are presumed to have received the

15   confidential information when co-counsel has communicated with the tainted

16   counsel.  Here, Perkins Coie admits extensive communication with Findley.

17                   *Second*, Defendants argue that *Pound* is distinguishable because the

18   disqualified attorney knew of the tainted attorney's conflict.  Of course, whatever

19   the state of Perkins Coie's knowledge, Open Text, the client of Perkins Coie and

20   Findley, *did* know about the conflict, placing this case squarely within *Pound* even

21   under Defendants' reading of it.  (Parker Decl. ¶ 4.)  Moreover, Defendants do not

22   cite *any* case holding that vicarious disqualification turns on whether the non-

23   conflicted lawyer knew of the conflict.  California law is the opposite.  *See City &*

24   *County of San Francisco* v. *Cobra Solutions, Inc.*, 38 Cal. 4th 839, 854 (2006)

25   (disqualifying entire City Attorney's Office because the head of the office

26   previously represented an adverse party, even though there was "no reason

27   whatsoever to believe" he knew of his former client's involvement when the case

28   began).  This is because "[l]awyer disqualification is prophylactic in nature . . . [it

                                   -12-

1   does] not turn on whether the lawyer in question willfully breached the rule, but on

2   the merits of the former client's interest in preserving the confidentiality of the

3   information imparted to the lawyer." (Cal. Bar Ethics Op. 1998-152, Johnson

4   Decl. Ex. 12.) The prejudice to j2 is the same whether Perkins Coie was exposed

5   to j2's confidential information knowingly or unknowingly. Disqualification here

6   is not about whether Perkins Coie itself acted in good faith or bad faith.

7        *Third*, Defendants argue that in *Pound* the conflicted and non-

8   conflicted attorneys had a "direct and close relationship," but in fact Findley was

9   far more involved in the litigation than was the conflicted attorney in *Pound*.  In

10  *Pound*,  the conflicted attorney met with the non-conflicted attorney "a few times"

11  and, as Open Text has here, testified that he did not pass along any information he

12  had learned in the prior representation, which consisted of a one hour meeting

13  three years before. *Id*. at 74.  Here, Findley worked with Open Text and Perkins

14  Coie for at least eight months on the litigation. (Parker Decl. ¶¶ 4-5.) Although

15  Defendants' many Declarations fail to reveal how many times Findley met or

16  spoke with Open Text internal lawyers or Perkins Coie, previous correspondence

17  makes clear that Findley's involvement over that eight-month period was

18  substantial, including meetings and conference calls with the Perkins Coie

19  litigation team regarding litigation strategy. (Sacks Decl. Ex. G at 2.)

20       Defendants' assertion that Findley was not "co-counsel," apparently

21  because he never "appeared on the record," is not relevant, but is also wrong.

22  (Opp. at 13 n.13.) Findley made an appearance for Open Text at the deposition of

23  David Farber. After the videographer asked all present to introduce themselves,

24  Findley stated on the record, "Clyde Findley from the law firm of Crowell &

25  Moring representing Open Text." (Johnson Decl. Ex. 13 at 7. ) Moreover, *Pound*

26  rejects a formalistic approach to vicarious liability, reasoning that confidences can

27  be passed to associated lawyers just as easily as lawyers in the same firm. *See id.*

28  at 77.  And indeed that is true here, where Findley was hired by Open Text to

-13-

1   advise it about the *Open Text* and *EasyLink* litigations and had extensive

2   communications with counsel of record during which any manner of confidential

3   communications were able to pass.  Defendants' attempt to impose a formalistic

4   limitation on *Pound* to "co-counsel" makes no sense.  Because Findley was

5   substantively involved in Open Text's defense of the litigation and communicated

6   directly with Perkins Coie in that effort, there was as much opportunity for the

7   exchange of information as there would have been had he been another lawyer at

8   Perkins Coie.  Regardless of what he in fact did, which we can never know, he

9   must be presumed to have revealed j2's confidential information to the lawyers at

10  Perkins Coie with whom he was working.

11              **C.      California's Rule Is Well-Founded.**

12              Defendants repeatedly suggest that California's strict vicarious

13  disqualification rule is unfair, and that disqualification is only appropriate if the

14  former client presents evidence that the lawyer it seeks to disqualify possesses its

15  confidential information.  (*E.g.*, Opp. at 13.)   But there are good reasons that

16  California does not require such a showing, particularly recognizing that the

17  ultimate goal is the protection of the former client and discouraging conduct that

18  tolerates ethical breaches of this sort.[7]  The presumption that an attorney directly

19  involved in substantially related litigation was exposed to confidential information

20  is necessary to avoid disclosing the former client's confidences through inquiry

21  into the actual state of the lawyer's knowledge in disqualification proceedings.

22  *H.F. Ahmanson & Co.* v. *Salomon Bros., Inc.*, 229 Cal. App. 3d 1445, 1453

23

24  ---

    [7]      California is not an outlier in its view that, at least under some
25  circumstances, conflicted attorneys should be presumed to have tainted non-
    conflicted attorneys.  For example, many jurisdictions *conclusively* presume that a
26  lawyer's knowledge of client confidences is transmitted to other lawyers in the
    firm.  *See* Flamm, Lawyer Disqualification at 535-36; *Kevlik* v. *Goldstein*, 724
27  F.2d 844, 849 n.5 (1st Cir. 1984) (citing *State of Arkansas* v. *Dean Food Products,
    Co., Inc.*, 605 F.2d 380 (8th Cir. 1979)); *U.S.* v. *Miller*, 624 F.2d 1198, 1204 (3d
28  Cir. 1980); *In re Am. Air*, 972 F.2d 605, 614 & n.1 (5th Cir. 1992); *Zarco Supply
    Co.* v. *Bonnell*, 658 So. 2d 151, 154-55 (Fla. Dist. Ct. App. 1995).

                                                                    -14-

1   (1991).  The rule is also necessary because the former client has no way to prove

2   what the attorney actually knows or does not know.  *Global Van Lines, Inc.*, 144

3   Cal. App. 3d at 489.  The same is true of non-conflicted attorneys, whether in the

4   same firm or not, who worked with the conflicted attorney:  there is no way to

5   prove what the conflicted attorney disclosed, particularly because the

6   communications that may have disclosed confidential information are privileged

7   and therefore not discoverable by the former client.

8           For these reasons, to the extent California has recognized exceptions

9   to the presumption that confidential information is obtained in the course of

10  representation on substantially related matters and shared with associated lawyers,

11  the exceptions are based on the lack of *opportunity* to obtain or share

12  confidences—not on unverifiable assertions that, despite the opportunity,

13  confidences were not obtained or shared.  For example, *Kirk* recognized that a

14  properly instituted and timely ethical screen may ensure that the tainted attorney

15  did not have the opportunity to share a former client's confidences, but that "it is

16  not sufficient to simply produce declarations stating that confidential information

17  was not conveyed or that the disqualified attorney did not work on the case; an

18  effective wall involves the imposition of *preventive measures* to guarantee that

19  information will not be conveyed."  *Id*. at 810; *see also City National Bank* v.

20  *Adams*, 96 Cal. App. 4th 315, 327-38 (2002) ("[T]here is a limited exception to

21  this conclusive presumption in the rare instance where the lawyer can show that

22  there was no *opportunity* for confidential information to be divulged.")  Here,

23  Perkins Coie admittedly discussed the case with Findley numerous times, so that

24  exception is not applicable.  Instead, Open Text relies on the assertion that despite

25  those many communications, Findley did not pass on the confidential information

26  that he is presumed to (and in fact did) possess and had every opportunity to

27  convey.  There is no basis in California law for the Court to entertain, much less

28  accept, that assertion, which entirely misses the point of the legal test.

-15-

## III.   DISQUALIFICATION IS WARRANTED EVEN IF CALIFORNIA LAW IS DISREGARDED.

Open Text asks the Court to cast aside California's well-settled disqualification rules in favor of a nebulous test that appears to be a combination of the test applied by two Federal courts that were unaware of controlling California law and a fault-based analysis that is not supported by any authority.  Even using Open Text's own test, however, disqualification is warranted here.

### A.   Open Text Knew About Findley's Conflict.

Open Text claims that "[i]n all the cases in which courts have imposed the drastic and disfavored vicarious disqualification remedy, there has been a knowing retention of conflicted counsel."  (Opp. at 1.)  But Open Text's retention of conflicted counsel *was* knowing.  Open Text's General Counsel admits that Findley told him in December 2011 that he "was employed as an associate at Kenyon & Kenyon and that, while there, he had performed a public prior art search related to a Bobo Patent."  (Parker Decl. ¶ 4.)  Findley also disclosed to Mr. Parker that his work for Kenyon raised a possible conflict that Crowell & Moring was investigating.  (*Id.*)  These disclosures, at a time when Kenyon was representing j2 in a lawsuit against Open Text asserting infringement of the Bobo Patent, clearly put Open Text on notice of the conflict—it certainly required Open Text to inquire further.  Open Text may argue that Findley did not state that his client at Kenyon was j2, but it was obvious from the facts Findley did disclose, and even assuming (implausibly) that Mr. Parker failed to put two and two together, Open Text's failure to inquire further amounts to willful blindness.

Open Text's willful disregard for its counsel's conflict is reinforced by the fact that before Crowell & Moring's purported conflicts check was concluded—at a time when Open Text admittedly knew there was a potential conflict—Open Text used Findley's services without bothering to inquire further about the potential issue.  (Parker Decl. ¶ 4.)  Further still, Open Text allowed

-16-

1  Findley—after j2 had notified Open Text, Perkins Coie and King & Spalding of
2  the conflict—to meet with King & Spalding to discuss the strategy of defending
3  the EasyLink cases.  (Sacks Decl. Ex. J.)  And if that were not bad enough, Perkins
4  Coie and its separate counsel did not accurately reveal the facts about Open Text's
5  knowledge to the Court at the October 24 hearing or in Defendants' Opposition
6  brief.  (Johnson Decl. Ex. 1 at 48-49; Opp. at 1, 6.)  Any suggestion by Open Text
7  that it is an innocent victim of Findley's ethical breach under these circumstances
8  must be rejected.[8]

9  **B.   There Is a Significant Risk that j2 Will Be Prejudiced if Perkins Coie Is Not Disqualified.**

10  Open Text argues that j2 has not been prejudiced by Findley's ethical
11  breach and that there is no risk of prejudice going forward, based on the assertions
12  that (i) Findley did not actually gain j2's confidential information, (ii) he did not
13  pass any information to Open Text, and (iii) Perkins Coie did not need the
14  information because it had already determined its strategy.  (Opp. at 17-20, 22-23.)
15  All of these assertions lack merit.  The first point is utterly false.  And
16  fundamentally, we do not know and will never know what Findley did or did not
17  say in his many communications with Perkins Coie and Open Text's in-house
18  counsel, or what information may have been unconsciously passed during those
19  discussions of litigation strategy.

20  **1.   *Findley Had Access to j2's Confidential Materials.***

21  Open Text's assertion that Findley did not have a close relationship
22  with j2 and never received material information regarding j2 is entirely
23  unsupported and contradicted by the evidence that j2 submitted with its Motion.
24  (Opp. at 18-20.)  Findley's billing records show that he spent a total of 234 hours

25

26

27  [8]   In addition, j2 produced to Perkins Coie a privilege log that listed
28  communications from Findley.  Open Text claims that Perkins Coie never read the
   log (Opp. at 20), but the log put Perkins Coie on inquiry notice of the conflict
   whether Perkins Coie was diligent enough to read it or not.

-17-

REPLY IN SUPPORT OF MOTION TO DISQUALIFY PERKINS COIE

1  on j2 matters, working on such issues as infringement analyses, including claim
2  charts; invalidity analyses, including prior art searches; discussing discovery
3  strategy and drafting and reviewing discovery requests and responses; drafting j2's
4  opposition to a dispositive motion in the *Venali* case; and communicating with
5  other lawyers at both Kenyon and Sullivan & Cromwell involved in representing
6  j2.[9]  (Bernstein Decl.[10])

7          Those matters go to the heart of j2's litigation strategies and view of
8  these cases.  The at least 300 emails that Findley sent or received further establish
9  his substantial involvement in the case.  Open Text suggests the Court should
10  disregard the billing records and emails because j2 did not produce them, but a
11  party is not required to waive privilege to seek the disqualification of its former
12  attorney.  *See H.F. Ahmanson & Co.*, 229 Cal. App. 3d at 1453.  That is precisely
13  why California law applies an objective test based upon the "substantial
14  relationship" of the subject matter of the representations.  Nevertheless, if the
15  Court wishes to see these materials, j2 remains willing to provide them for *in*
16  *camera* review.  The detail that j2 has provided is far more than enough to compel
17  the conclusion that Findley's exposure to j2's confidential materials was extensive.

18
19          **2.   *There is a Substantial Risk that Findley Conveyed Material, Confidential Information to Perkins Coie.***

20          Defendants argue that disqualification is unnecessary because Perkins
21  Coie never received j2's confidential information from Findley.  (Opp. at 17-18.)

22
23  _____

24  [9]      Venali's summary judgment motion was based on the argument that "audio
25  message" in the '638 Patent should be construed to mean only voice messages, and
   not fax messages.  (Johnson Decl. Ex. 3.)  Open Text and EasyLink asserted the
   same argument in claim construction proceedings in this case.

26  [10]     Open Text's suggestion that Frank Bernstein's Declaration about Findley's
27  work as a Kenyon associate lacks foundation is absurd.  (Opp. at 9-10; 19.)  Mr.
   Bernstein is a partner at Kenyon, and was a partner in 2005 during part of
28  Findley's time at Kenyon. His Declaration concerns Kenyon's records of which he
   has possession, and which j2 has offered to make available for *in camera* review.

-18-

1  Defendants have admitted that Perkins Coie communicated with Findley (notably

2  absent from all of Perkins Coie's many denials is disclosure of the most relevant

3  fact—the number and timing of those communications), including participating in

4  meetings and conference calls with the Perkins Coie and King & Spalding

5  litigation teams regarding litigation strategy.  But, it claims that Findley did not

6  disclose j2's confidential information in those meetings and calls.  That un-testable

7  assertion is based on Open Text disparaging Findley as a "potted plant" who never

8  said anything in meetings (Johnson Decl. Ex. 1 at 13) and the declarations that

9  Open Text submitted from the Perkins Coie litigation team.

10        *First*, Defendants' characterization of Findley as a "potted plant" is

11  implausible.  Findley has been practicing law for ten years, has another twenty

12  years of experience as a software engineer, technical manager and business

13  executive, and achieved the position of Counsel in a respected national law firm.

14  (Johnson Decl. Ex. 14.)  He was not hired to do menial work—the position he

15  assumed for Open Text was sufficiently specialized and sensitive that Open Text

16  turned to its outside counsel to fill the position only after searching for a candidate

17  and finding that it was "unable to fill [the] role."  (Davies ¶ 6.)  The assertion that a

18  Crowell & Moring counsel with ten years of experience was hired to sit mute in

19  meetings, or that he was retained in the position for eight-plus months without

20  providing his client or his client's other lawyers with any substantive advice or

21  counsel, is simply not credible.

22        *Second*, the self-serving, largely boilerplate declarations submitted by

23  Perkins Coie attorneys also should not be credited.  As an initial matter, there is not

24  any way for Perkins Coie to have known that whatever input Findley gave them

25  was colored or informed by what he learned when he was j2's lawyer.  It is not

26  necessary that that Findley passed on information that on its face came from j2.

27  The concern is that he gave input, such as about which discovery is important

28  enough to pursue (as just one example), that was based in some part on j2's

-19-

1  confidential and privileged information.  Nor is there any way to know how much

2  of Perkins Coie's interaction with Open Text's internal lawyers reflected input,

3  consciously or not, from Findley.

4          Moreover, the Perkins Coie Declarations are unverifiable.  They

5  purport to characterize eight months of privileged communications, which j2

6  cannot inquire into without invading Open Text's privilege.  It is for precisely this

7  reason that California has imposed an irrebutable presumption that attorneys who

8  work with a tainted attorney have received illicit information.  The only verifiable,

9  non-privileged facts that could matter are who Findley spoke to, when, how many

10 times, and about what.  The Declarations fail to provide that information,

11 presumably because Findley's communications with Open Text and Perkins Coie

12 were extensive.

13         If, contrary to California law, Open Text is permitted to rely upon the

14 Perkins Coie Declarations, then it must waive privilege and work product over all

15 oral and written communications involving Findley, and j2 must be permitted to

16 test the declarations via discovery, including both depositions and document

17 discovery.  Open Text cannot on the one hand assert that Perkins Coie received no

18 tainted information or advice from Findley despite its numerous communications

19 with him, while on the other hand withholding the communications that would

20 prove or disprove that assertion on privilege grounds.  *See Chevron Corp.* v.

21 *Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992).

22         **3.    *There Is Significant Risk That Whatever Information
                   Findley Conveyed to Perkins Coie Was and Will Be
23                 Used to j2's Detriment.***

24         Defendants argue that there is no risk of prejudice to j2 because

25 Perkins Coie had already developed Open Text's defenses by the time Findley was

26 hired in 2011, and that at this point there is little left to be done in the case.  (Opp.

27 at 5, 7, 17-18; Carroll Decl. ¶ 27.)

28

-20-

1    This argument is entirely undercut by Defendants' assertion that they

2    will suffer severe prejudice if it is deprived of its chosen counsel in this case.

3    (Opp. at 22-24.)  If enough substantive issues remain to make it important to

4    Defendants to retain Perkins Coie, then enough issues remain to create a risk that

5    j2 will be prejudiced by Perkins Coie's exposure to its confidential information.

6    There is significant fact discovery remaining—for example, Open Text recently

7    noticed seven depositions—as well as expert reports and discovery, dispositive

8    motions and trial.  Nor is Open Text's claim that it developed its theories a long

9    time ago persuasive.  Open Text amended its invalidity contentions and initial

10   disclosures less than two weeks ago and filed a motion to amend its counterclaims

11   that is currently pending.  The suggestion that Open Text's case has not evolved

12   since 2011 is inaccurate.  (Carroll Decl. ¶ 27.)

13   Defendants also argue that Findley's receipt of a memo from j2's

14   then-senior patent litigator (John Altmiller of Kenyon, now retired) that discussed

15   David Farber could not have prejudiced j2, because Perkins Coie learned of Farber

16   before Findley was hired.  (Opp. at 17-18.)  But j2's concern is not that Findley

17   disclosed Farber's identity.  It is that Findley revealed, consciously or

18   unconsciously, the *views of j2's lawyers* about Farber, or provided input or advice

19   that was colored, consciously or unconsciously, by Findley's knowledge of the

20   views of j2's lawyers.  The Perkins Coie Declarations state that this did not occur,

21   but they could not know that.  They easily could have received input from Findley

22   without knowing it was colored by his knowledge of j2's counsel's opinions.  In

23   any case, it is impossible to test their declarations without a privilege waiver.

24   Short of a privilege waiver, j2 and the Court are left to guess at what

25   may have been communicated, but the sequence of events is telling.  Before

26   Findley's ethical breach, Perkins Coie may have known of Farber's existence, but

27   he was not mentioned in Open Text's counterclaims or invalidity contentions.

28   (Case No. 09-4150, Dkt No. 117; Johnson Decl. Ex. 15.)  After Findley's breach,

-21-

1    Open Text served new invalidity contentions referring to Farber at length, and has

2    moved to amend its counterclaims to make new allegations concerning Farber.

3    (Johnson Decl. Ex. 4; Case No. 09-4150, Dkt. No. 337.)  And before Findley's

4    breach, neither Open Text nor any of the defendants in related cases made any

5    effort to depose Farber, even though Defendants say they knew about him more

6    than a year earlier.  Only after Findley's breach did Open Text and EasyLink

7    depose Farber.  Findley appeared at that deposition on behalf of Open Text.

8    (Johnson Decl. Ex. 13 at 7.)  In short, Open Text began focusing on Farber only

9    *after* retaining Findley.  The inference is obvious.

10              **C.    Defendants' Authority Is Inapposite.**

11              In light of the foregoing, the cases Defendants rely upon are

12   inapposite, even setting aside that they fail to acknowledge controlling California

13   law.  In *Canatella* v. *Krieg, Keller, Sloan, Reilley & Roman*, the conflicted attorney

14   spent only 7 hours on the prior representation, and the Court viewed it as unlikely

15   that confidential information was given to the non-conflicted firm "given the

16   unrelated nature of the two different representations."  2012 WL 847493, at *2

17   (N.D. Cal. Mar. 13, 2012).  Here, Findley spent 234 hours on the prior

18   representation, and this case involves many of the identical issues that were in the

19   *Venali* and *CallWave* cases.  Similarly, in *In re Airport Rental Antitrust Litigation*,

20   the conflicted attorney spent only one to one and a half hours meeting with the

21   former client.  *See* 470 F. Supp. 495, 502 (N.D. Cal. 1970).  Finally, in *Oracle*

22   *America, Inc.* v. *Innovative Tech. Distrib., LLC*, there was no evidence that the

23   conflicted attorney had worked with the non-conflicted attorney.  *See* 2011 WL

24   2940313, at *17 (N.D. Cal. July 20, 2011).

25              A recent case in this District that disqualified co-counsel is much

26   more factually similar than the cases Open Text cites.  In *Beltran* v. *Avon*

27   *Products, Inc.*, plaintiff was represented by two law firms, one of which employed

28   a lawyer who previously represented Avon, spending 336 hours working on

-22-

REPLY IN SUPPORT OF MOTION TO DISQUALIFY PERKINS COIE

1  Avon's litigation matters.  *See* 2012 WL 2108667, at *3 (C.D. Cal. June 1, 2012).

2  The court disqualified the conflicted lawyer because he had actual and presumptive

3  possession of Avon's confidential information, and disqualified his firm because it

4  waited two weeks to put an ethical wall in place.  *See id*. at *9-10.  The court then

5  concluded that co-counsel must be disqualified as well, because they had

6  collaborated with the conflicted firm in filing the complaint, and it "is also

7  reasonable to assume that the two law firms engaged in fairly extensive discussions

8  about the case and Plaintiff's litigation strategy before filing their complaint."  *Id*.

9  at *11.  Thus, the court did not require conclusive evidence that confidential

10  information was exchanged; it was enough that the conflicted and non-conflicted

11  attorneys had sufficient contact to infer that confidential information may have

12  been exchanged—precisely the test under California law.  The contact between

13  Findley and Perkins Coie over eight months, with no attempt whatsoever to impose

14  an ethical wall, was far more extensive than the brief collaboration in *Beltran*, and

15  thus creates the same inference that confidential information likely was exchanged.

16  **D.    Disqualification Is the Only Equitable Outcome.**

17  Defendants argue that they will be prejudiced if forced to replace

18  Perkins Coie.  Whatever prejudice they suffer, however, is a result of Open Text's

19  failure to take appropriate steps when Findley informed Open Text's General

20  Counsel of his conflict.  If one party as between j2, which has seen its attorney

21  breach his ethical duties and risks the disclosure of its confidential information,

22  and Open Text, which intentionally or recklessly employed j2's lawyer to assist in

23  litigation against j2, must suffer prejudice, it should be Open Text.

24  As noted by the Court at the October 24 hearing, there is no perfect

25  remedy for Findley's disregard for his ethical obligations.  Although Open Text

26  and Perkins Coie have refused to provide any meaningful information about their

27  interactions with Findley, it is undisputed that Findley met numerous times about

28  this litigation with lawyers from Perkins Coie, Open Text, and King & Spalding.  It

-23-

1   also is undisputed that Findley attended a potentially significant third party

2   deposition.  And, it is undisputed that, even after j2 noted his conflict, Findley met

3   with EasyLink's counsel specifically for the purpose of discussing an evaluation of

4   the litigation.  Under these circumstances, there is simply no justification, or case

5   support, for taking no steps to remedy the harm to j2.

6          At a minimum, Perkins Coie must be disqualified from participating

7   in these actions.  *See Pound*, 135 Cal. App. 4th at 73.  The reasoning of *Pound* also

8   dictates that the Court preclude any of Open Text's in-house counsel who were

9   exposed to Findley from participating in this litigation in any way.  Many of the

10  cases cited by Defendants discuss how ethical screens, although imperfect, can be

11  employed to minimize the harm caused by these ethical issues.  Consistent with

12  this authority, after disqualifying Perkins Coie from these matters, the Court should

13  order Open Text to ethically wall off all tainted in-house counsel from the new

14  lawyers retained by Defendants.  In this way, the Court's concern that Open Text's

15  in-house counsel may already possess j2's confidential information is addressed.

16         The significance and impact of the requested remedy is neither lost on

17  nor minimized by j2 or its counsel.  Well-settled law and important public policies,

18  however, support this remedy.  As noted above, California case law requires the

19  disqualification of the tainted lawyers.  Moreover, as Justice Moreno noted in his

20  improper Declaration, the paramount concern and ultimate touchstone for the

21  Court must be to preserve public trust in the administration of justice and the

22  integrity of the bar.  (Moreno Decl. ¶ 23.)  This is consistent with the California

23  State Bar's pronouncement that "[t]he California Rules of Professional Conduct

24  exist to protect the respect and confidence in the legal profession."  Cal. Bar Ethics

25  Op. 1998-152 at *4, Johnson Decl. Ex. 12.  That ethics opinion states:

26             It is these very concerns which have lead California
               courts to apply the imputed knowledge rule.  Indeed,
27             recent decisions have reiterated the role of the imputed
               knowledge rule in maintaining client confidential
28             information in order to ensure public trust in the judicial

-24-

system.  (*Rosenfeld Construction Co.* v. *Superior Court*, *supra*, 235 Cal.App.3d at p. 578; see also *Cho* v. *Superior Court*, *supra*, 39 Cal. App. 4th at p. 125, "[n]o amount of assurances or screening procedures, no 'cone of silence' could ever convince the opposing party that the confidences would not be used to its disadvantage …. No one could have confidence in the integrity of a legal process in which this is permitted to occur without the parties' consent.").

*Id*.  In light of the binding California case law and the pronouncements of the California State Bar, granting j2's Motion is the only way to preserve public trust in the administration of justice and the integrity of the bar.  Anything else simply risks encouraging the very ethical lapses that are undisputed here.

## CONCLUSION

For the foregoing reasons, j2 respectfully requests that the Court disqualify Perkins Coie, and wall off Open Text's in-house counsel who have had contact with Findley.

Dated:  November 5, 2012                    Respectfully submitted,


/s/  Robert A. Sacks
Robert A. Sacks (SBN 150146)
Brian R. England (SBN 211335)
Edward E. Johnson (SBN 241065)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067-1725
(310) 712-6600
(310) 712-8800 facsimile

Frank L. Bernstein (SBN 189504)
KENYON & KENYON LLP
1801 Page Mill Road, Suite 210
Palo Alto, California 94304-1216
(650) 384-4700
(650) 384-4701 facsimile

*Attorneys for Plaintiffs j2 Global, Inc. and Advanced Messaging Technologies, Inc.*

-25-