# Exhibit 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4                    - - -

5    HONORABLE DEAN D. PREGERSON, DISTRICT JUDGE PRESIDING

6

7    j2 GLOBAL COMMUNICATIONS,        )
     INC., ET AL.,                    )
8                                     )
            Plaintiffs,               )
9                                     )
                                      )
10                                    ) No. CV 09-04189-DDP
          vs.                         ) No. CV 11-04239-DDP
11                                    ) No. CV 09-04150-DDP
                                      )
12                                    )
     EASYLINK SERVICES                )
13   INTERNATIONAL CORPORATION,       )
     ET AL,                           )
14
            Defendants.
15   _____

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18                 *MOTION HEARING*

19             LOS ANGELES, CALIFORNIA

20           WEDNESDAY, OCTOBER 24, 2012

21   _____

22              MARIA R. BUSTILLOS
              OFFICIAL COURT REPORTER
23               C.S.R. 12254
            UNITED STATES COURTHOUSE
24          312 NORTH SPRING STREET
                  ROOM 404
25         LOS ANGELES, CALIFORNIA 90012
               (213) 894-2739

Exhibit 1, Page 3

1                    **A P P E A R A N C E S**

2

3

4     **ON BEHALF OF THE PLAINTIFFS,**
      **j2 GLOBAL COMMUNICATIONS,**          SULLIVAN & CROMWELL, LLP
5     **INC., ET AL.:**                      BY:  ROBERT SACKS, ESQ.
                                             1888 CENTURY PARK EAST
6                                            SUITE 2100
                                             LOS ANGELES, CA 90067-1725
7                                            (310) 712-6600
                                             SACKSR@SULLCROM.COM
8

9                                            SULLIVAN & CROMWELL, LLP
                                             BY:  BRIAN ENGLAND, ESQ.
10                                           1888 CENTURY PARK EAST
                                             SUITE 2100
11                                           LOS ANGELES, CA 90067-1725
                                             (310) 712-6600
12                                           ENGLANDB@SULLCROM.COM

13
                                             KENYON & KENYON
14                                           BY:  FRANK L. BERNSTEIN
                                             1801 PAGE MILL ROAD
15                                           SUITE 210
                                             PALO ALTO, CALIFORNIA 94304
16                                           (650) 384-4701

17
      **ON BEHALF OF THE DEFENDANTS,**
18    **EASYLINK SERVICES**                  PERKINS COIE
      **INTERNATIONAL CORPORATION,**         BY:  TIMOTHY CARROLL, ESQ.
19    **ET AL.:**                            30 ROCKEFELLER PLAZA
                                             25TH FLOOR
20                                           NEW YORK, NY 10112
                                             (312) 324-8446
21

22                                           PERKINS COIE
                                             BY:  MANNY J. CAIXEIRO, ESQ.
23                                           30 ROCKEFELLER PLAZA
                                             25TH FLOOR
24                                           NEW YORK, NY 10112
                                             (312) 977-1671
25

Exhibit 1, Page 4

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE DEFENDANTS,
      EASYLINK SERVICES             ROBIE & MATTHAI
 4    INTERNATIONAL CORPORATION,    BY:  EDITH R. MATTHAI
      ET AL.:                       500 SOUTH GRAND AVENUE
 5                                  15TH FLOOR
                                    LOS ANGELES, CA 90071
 6                                  (213) 706-8000

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 1, Page 5

1                        **I N D E X**

2                                                      PAGE

MOTION HEARING:                                         5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 24, 2012

 2                              -o0o-

 3               (COURT IN SESSION AT 11:39 A.M.)

 4          THE CLERK:  Calling item one, CV 09-04189-DDP:

 5   j2 Global Communications, Inc. vs. Easylink Services.

 6          Calling item two, CV 11-04239-DDP:  Advanced

 7   Messaging Technologies, Inc. vs. Easylink Services

 8   International Corporation.

 9          Calling item three, CV 09-04150-DDP: J2 Global

10   Communications, inc. vs. Captaris, Inc.

11          Counsel, may we have appearances for all three

12   matters, please.

13          MR. SACKS:  Good morning, Your Honor.

14   Robert Sacks and Brian England from Sullivan and Cromwell and

15   Frank Bernstein on all three cases.

16          THE COURT:  Good morning.

17          MR. CARROLL:  Good morning, Your Honor.

18   Timothy Carroll and Manny Caixero from Perkins Coie on behalf

19   of Open Text, EasyLink and Captaris, the defendants in these

20   matters.

21          I'm also joined today by Edith Matthai.

22          MS. MATTHAI:  Of Robie and Matthai, appearing for

23   Perkins Coie.

24          THE COURT:  Okay.  Mr. Sacks...

25          MR. SACKS:  Yes, sir.
```

```
 1              THE COURT:  I get the big picture.  Where are we?
 2   I mean, I understand that Perkins Coie was co-counsel with
 3   the Crowell firm.  And for some --
 4              MS. MATTHAI:  No.
 5              THE COURT:  No?  No?
 6              MR. SACKS:  Not of record.  But yes, they -- they
 7   worked with Mr. Findley at the Crowell firm for what we
 8   understand to be approximately eight months in connection
 9   with the defense of these cases.  That's based upon the
10   information that we've been given.
11              THE COURT:  Okay.  Well, when did -- Okay.  Well,
12   help me with the timing then.
13              MS. MATTHAI:  There -- there are significant
14   factual disputes here.  There was a period of time when
15   Mr. Findley of Crowell & Moring who had been retained by
16   Open Text did have contact with Perkins Coie, but they were
17   not working together handling the case as has been suggested
18   in the motion.  So there are significant --
19              THE COURT:  The firms -- the firms were not --
20   well, let's just break it down.  Crowell represented
21   Open Text; right?
22              MS. MATTHAI:  Yes.
23              THE COURT:  And Perkins Coie represented Open Text?
24              MS. MATTHAI:  Yes.
25              THE COURT:  And Open Text acquired EasyLink?
```

```
 1              MR. CARROLL:  Right.

 2              THE COURT:  Right?

 3              MR. CARROLL:  Right.

 4              THE COURT:  Okay.

 5              MR. CAIXEIRO:  (Nodding.)

 6              THE COURT:  Why don't you just tell me then what

 7    the -- what the relationship is between Perkin's --

 8    Perkin Coie's representation in these matters and -- and

 9    Crowell's representation in these matters.

10              MR. CARROLL:  Your Honor, once again,

11    Timothy Carroll.  If I may, sir...

12              You may recall that these cases initially were

13    filed in 2008 in Texas and ultimately, were transferred here

14    to you in 2009, and there have been some additions in terms

15    of parties and patents.  And I've been counsel for Open Text

16    dating back to 2008.  And historically, I've been Open Text's

17    primary outside litigation counsel for a wide variety of

18    matters, patent, IP, licensing internal investigations and

19    otherwise.

20              As you may also recall also, Your Honor, we've had

21    several proceedings here before you, including two claim

22    construction rulings and hearings.  We've had some discovery

23    disputes along the way.  And these cases, of course, have

24    been pending, you know, for years now going into the case.

25              Open Text -- Open Text had -- has a variety of --
```

1    of things under way internal to it, including patent

2    harvesting, developing a patent program.  It does acquire

3    organizations from time to time.  There are IP litigation

4    disputes, et cetera that are in play.  And the legal group at

5    Open Text determined that it wanted to hire an in-house

6    lawyer with an IP capacity who could assist them on

7    IP-related matters: patent prosecution, patent harvesting,

8    product launches, things along those lines.  And not

9    withstanding the roughness or the turmoil of the economy,

10   they couldn't find a candidate that really fit the bill and

11   was the person they were looking for.

12          Crowell & Moring represents Open Text on corporate

13   matters and securities matters.  Crowell & Moring does not

14   represent Open Text on litigation matters.  I do.  And I

15   have.  As I understand it, Crowell & Moring agreed to make

16   one of its patent lawyers available to Open Text, essentially

17   on a secundum kind of arrangement where they would come to

18   some sort of economic arrangement.  I wasn't privy to these

19   discussions, but nonetheless, this person would serve in the

20   general IP advisory capacity for a period until they could

21   find somebody who would long-term fill that need.  The person

22   who ultimately was proffered up for that role was

23   Clyde Findley.

24          Now, I think it's important to note that

25   Mr. Findley was never co-counsel.  He wasn't counsel of

```
 1    record.  He never directed any of the strategy.  I did -- or

 2    members of my team did.

 3              THE COURT:  I'm sorry.  When you say "he," are you

 4    referring to his firm and he, or just he individually?

 5              Let's just be precise.

 6              MR. CARROLL:  Yeah.  Both.  Neither Crowell nor

 7    Mr. Findley directed, suggested the type of decisions that we

 8    were going to make relative to this litigation.  And, in

 9    fact, Your Honor, the period that he was involved with

10    Open Text in this internal capacity, was very late in the

11    case.

12              THE COURT:  Well, was -- I mean, you know, I have a

13    lot of cases.  I have a lot to keep track of.

14              So was -- what was Crowell's litigation capacity in

15    these cases that I've had?

16              MR. CARROLL:  Crowell's never been involved in

17    these litigation matters.

18              THE COURT:  They've never had -- they've never

19    entered an appearance in any matter?

20              MR. CARROLL:  No, they've never argued before you.

21    They -- it was just this instance over the summer basically

22    where Mr. Findley served in this advisory capacity at

23    Open Text and general IP matters, was involved; but again, he

24    wasn't directing the strategy, Your Honor.  He wasn't making

25    the decisions.  And, in fact, Open Text has a chief legal
```

```
1    officer by the name of Gordon Davies -- I'm sure you don't
2    remember Mr. Davies, but he's been in your courtroom before.
3    Mr. Davies is the decision maker for Open Text relative to
4    these matters.
5              THE COURT:  So Mr. Findley acted as a de facto
6    in-house advisory counsel on IP matters for Open Text,
7    essentially on loan from Crowell?
8              MR. CARROLL:  That's right, Your Honor.
9              THE COURT:  Okay.  And he worked essentially
10   exclusively for Open Text?
11             MR. CARROLL:  I don't know that.  I don't know
12   that, Your Honor.
13             THE COURT:  But that was the -- that's what was --
14   Open Text's desire, at least, was to have someone in-house to
15   maybe sort of help coordinate all of these things.
16             MR. CARROLL:  I think that's right, Your Honor.
17             THE COURT:  Okay.
18             MR. CARROLL:  And they have since added somebody to
19   fulfill that role -- an attorney out of Boston.
20             THE COURT:  I see.  Okay.  Go on.
21             MR. CARROLL:  So in terms of the motion that
22   Mr. Sacks and his firm have brought, there are points
23   historically -- I don't want to -- you know, historically, I
24   want to make it clear that, Your Honor, much of the case has
25   progressed to the point where we're near in the end of it.
```

```
 1     In fact, the fact discovery cutoff date which has already

 2     been extended several times --

 3             THE COURT:  I'm not worried about that issue right

 4     now.  I want to understand what went on here.

 5             MR. CARROLL:  Okay.

 6             THE COURT:  Okay.

 7             MR. CARROLL:  What can I help address, Your Honor?

 8             THE COURT:  Well, what can you help address?

 9             I want to know what interactions you or your firm

10     had with Mr. Findley.

11             MR. CARROLL:  Uh-huh.  Certainly.

12             THE COURT:  That's the issue; right?

13             MR. CARROLL:  Well, there are several issues, and

14     I'd be happy to address that precise question, Your Honor.

15             THE COURT:  Isn't that the primary issue?

16             MR. CARROLL:  Well, I think there are several

17     layers of this, but I'd be happy to describe that.

18             THE COURT:  Sure.  Go ahead.

19             MR. CARROLL:  So the representation of Open Text

20     and EasyLink consist of several lawyers in my firm: myself

21     Mr. Caixero, Mr. Carmody, Mr. Palmer, Mr. Lubezny -- and

22     there are some other junior associates who assisted on the

23     matters; but in the course of the last year, we were

24     completing -- working diligently to complete our discovery

25     productions to j2.  J2 had asked for us to provide a
```

```
 1    certification that our discovery productions were complete.
 2    And we had meet-and-confer sessions, and we agreed by a date
 3    certain we'd have everything substantially done by X date.
 4    In order to fulfill that obligation -- that commitment I
 5    made, we, of course, insisted that the client help us locate
 6    further documents; look in repositories; confirm whether
 7    information had been turned over for forensic processing, et
 8    cetera.
 9           When there were holdups in that process or a
10    paralegal in an Open Text office in Bellevue, Washington
11    wouldn't get back to me or people on my team, on one occasion
12    I called Mr. Findley and I asked him, Can you help facilitate
13    the location of that information and get the paralegals'
14    internal to Open Text to confirm that they've given us the
15    materials.
16           In another instance, Jonathan Sea or See -- he is
17    an employee of Open Text, j2 has asked to depose him.  And I
18    had a discussion with Mr. Findley about dates of availability
19    for Mr. Sea.
20           There was a meeting that was held in Chicago in my
21    office where Mr. Davies the CLO, the general counsel of
22    Open Text Mr. Parker, the head of IP for Open Text,
23    Paul Lewis, myself, Mr. Caixero, Mr. Carmody and Mr. Findley
24    were in attendance.  I prepared -- or people on my team on my
25    direction prepared the materials that we were going to use in
```

```
 1    discussing the strategic calls that we were going to make in

 2    the case to close out fact discovery to move into the expert

 3    phase to seek summary judgment.  And Mr. Findley was present

 4    in the room.  Now, he didn't contribute anything to those

 5    discussions.  He didn't direct anything relating to those

 6    discussions.  He never saw an advanced copy of my briefing

 7    materials that I submitted to the client.  I would say that,

 8    you know, he was present; but he was a potted plant,

 9    essentially.

10            You know, along those lines, Your Honor -- you

11    know, I'm, of course, sharing with you what comes to mind.

12    You know, there were other matters that were wholly unrelated

13    to this litigation -- patent matters assessing opportunities,

14    whether to acquire patents where Open Text was invited to bid

15    on a patent, I think that j2 actually just bought, where I

16    know, you know, there were things that were under

17    consideration that I wasn't exposed to; but at no time,

18    Your Honor, did Mr.  Findley ever disclose any information to

19    me or any member of my team.  And when I learned of this

20    issue, I called Mr. Findley, and I asked him, What happened.

21    He told me that he recalled doing work in 2004 -- small

22    amount of work, doing public prior art searches in connectin

23    with some patents that j2 owned.  His firm had vetted it and

24    ran conflicts; determined there was no conflict.  And, you

25    know, that was the nature of it.
```

```
1          THE COURT:  Is that consistent with the 234 hours
2    of work that we know that he billed?  Does that sound like
3    234 hours worth of work?
4          MR. CARROLL:  Your Honor, he did public --
5          THE COURT:  And I'm not putting you on hot seat
6    here.  You know, you may be a victim in this process as well.
7    So I don't -- I'm not -- I'm not looking at this matter any
8    other way.  I just want to understand what happened.
9          MR. CARROLL:  By all means, Your Honor.  And I'm
10   trying to be as forthcoming as possible as I can, because at
11   the end of the day from my perspective, whether I'm the
12   victim or not, I'll leave that to the decision to be made by
13   others; but at the end of the day, I built the litigation
14   strategy that Open Text has used in connection with these
15   cases.  And we've done it --
16         THE COURT:  You know, I just worry -- I mean, the
17   worry is whether Mr. Findley somehow contaminated this
18   litigation and created a situation where j2 is unfairly
19   disadvantaged because strategy -- other confidential
20   information -- whatever it might be -- might have been
21   communicated, perhaps not directly by Mr. Findley to you or
22   your firm, but through another person who Mr. Findley may
23   have come into contact with, for example, at his firm and
24   then to your firm.  So I just don't have any -- I don't have
25   anyway of valuating that situation.
```

1           MR. CARROLL:  Well, you do, Your Honor.  You have

2    my word as an officer of the Court that Mr. Findley has never

3    shared any information about j2, even the fact that he did

4    work for j2 with me.  And I confirmed that principle with

5    each member of my team.  And the minute we learned of the

6    issue --

7           THE COURT:  You mean that he never communicated

8    with anyone at his own firm at Crowell about anything that he

9    may have learned while he was at j2 and that no one at

10   Crowell then communicated with anyone from your firm?  How

11   would we know that?

12          MR. CARROLL:  Well, I've asked the question to my

13   team, Has anybody from Findley or -- or the gentleman he --

14   he worked with, Mark Supco (phonetic), have they ever

15   communicated information to you about j2 -- anything?

16          And the answer was uniformly, "No, we had no idea."

17          THE COURT:  Mr. Findley only worked with one other

18   person on this litigation while at Crowell?

19          MR. CARROLL:  As far as I know, as far as I know.

20   And to say that he worked on the litigation, Your Honor, I

21   think is an overstatement.  It's -- he didn't -- he -- he saw

22   materials.  He was present when discussions were held; but,

23   you know, the depositions, the strategies the discovery, the

24   correspondence, the pleadings, we did that.  That was our

25   work product.  That was our familiarity with the record.

1    These are strategies that we have been developing and

2    executing for years.

3            And, you know, the notion that he somehow conveyed

4    information to us -- now, the principal thing here -- and I

5    think the maybe 800-pound gorilla or the pink elephant in the

6    corner of the room, is a gentleman by the name of

7    Dr. David Farber.  Okay.  Now, we have contended, as have

8    other parties, that j2 failed in its duty of candor to the

9    patent office by not disclosing its own system JFax, which

10   was available in the public marketplace before each of the

11   relevant patent applications were filed.  And through due

12   course in discovery, j2 produced to us, long before anybody

13   had ever heard of the name Clyde Findley, -- j2 had produced

14   to us documents, that had disclosed Dr. Farber's identity and

15   revealed that he did some testing -- public testing of JFax

16   in 1996.

17           There is an associate at -- former associate at

18   King & Spalding named Brent Bellows -- and I confirmed this

19   point this week and I confirmed it a month ago and I

20   confirmed it five months ago when the issues first arose...

21           Mr. Bellows of King & Spalding and my team were

22   splitting litigation-related strategies and executing

23   different tasks.  They were looking at the inequitable

24   conduct, allegations against j2.  Mr. Bellows reviewed

25   documents produced by j2 that disclosed Farber.  He then

1    reported that to the person he was supervised by, who

2    discussed it with a member of my team, Mr. Carmody.

3          From that point on, we did searching in the public

4    record about who Dr. Farber was; how he tested JFax, whether

5    that was public information, et cetera.  And what we found is

6    that his testing of JFax in 1996 was publicized in the

7    *New York Times* in the trade publications and some

8    Georgia-related publications.  It was all out there for the

9    world to see, okay.  So we, of course, wanted to depose

10   Dr. -- we had communications with Dr. Farber to confirm these

11   points and that we wanted to depose him to make our record to

12   support the inequitable conduct case.  It turns out that

13   these were issues that according to the j2 pleadings that

14   were submitted to you that they claimed that Mr. Findley had

15   worked on while at Kenyon & Kenyon.

16         Now, you know, Your Honor, I'm not the smartest

17   lawyer in the world and I don't pretend to be, but I'm not

18   dumb.  If I had thought that this guy had done work for j2

19   while on these issues, I would not have permitted him to go

20   to that deposition; I would not.  So the notion that he

21   somehow gave us knowledge or imputed knowledge about these

22   issues is -- is erroneous.  It was in j2's document

23   productions.  It was a matter of public record --

24         THE COURT:  In what context was it in the document

25   productions?

```
 1              MR. CARROLL:  In a DVD delivered by Mr. Johnson by
 2     Mr. Sacks' firm.
 3              THE COURT:  And what was the -- what was disclosed?
 4     Tell me.  You say it was disclosed in the document.  What
 5     type of document?
 6              MR. CARROLL:  I could proffer those many to you.
 7              MR. CAIXEIRO:  I could -- I could describe them
 8     generally, but they were, you know, public postings to -- to
 9     I believe public Internet forums, describing the fact that
10     Dr. Farber had tested and worked with the JFAX system that
11     describes generally what was in the document production.  And
12     then there was also interrogatories and document requests,
13     long before Mr. Findley came on board following up on that
14     document -- those documents regarding Dr. Farber's use of the
15     JFax system.
16              MR. CARROLL:  Your Honor, if I -- if I may, I don't
17     have copies of this for everyone; but I have a document that
18     I could show to you -- at least an image of a document which
19     has a Bates label on there imposed by j2 which reveals the
20     specific Farber communication that was in their document
21     production.  I'd be happy to tender it to the Court.
22              THE COURT:  I'll take a look.
23                  (Pause in the proceedings.)
24              MR. CARROLL:  So you see that document bears a j2
25     stamp from its Bates' labeling process.
```

```
 1              THE COURT:  Yeah, let's see much.

 2              MR. CARROLL:  And that production was made at least

 3     12 months before Findley ever had any involvement in these

 4     matters.  I believe that the -- the review by Mr. Bellows

 5     occurred in the summer of 2010 -- so at least maybe a year

 6     and --

 7              THE COURT:  So what is this document?  It looks

 8     like a printout from a web page.

 9              MR. CARROLL:  That's right.  As I understand it,

10     j2's founder Jack Rieley, was looking for people to validate

11     JFax in the marketplace in 1996.  It was a startup company, a

12     new venture.  We haven't been able to confirm that with

13     Mr. Rieley.  He's in Germany.  And we haven't been able to

14     take his deposition, but our understanding is he was looking

15     for validation from somebody who was well-regarded in the

16     technology field to say that JFax works and is a viable

17     product for computerize faxing.

18              So in connection with that, he, Rieley, and Farber

19     have conversations where Farber is asked about his use of

20     JFax.  And he publically posts what you see, Your Honor, in

21     front of you.

22              THE COURT:  So Rieley lets Farber beta test it.

23              MR. CARROLL:  Essentially.

24              THE COURT:  And then Farber communicates back in a

25     public forum?
```

Exhibit 1, Page 21

1          MR. CARROLL:  Yes.  Yes, this was very public.  In

2     fact, Your Honor, I think I had sent Mr. Sacks -- I'm not

3     sure if these were attached to his motion, but a *New York*

4     *Times* communication where the Farber testing of JFax in '96

5     was there for the world to see.

6          THE COURT:  Is this -- does this document provide

7     the context that it was dealing with this alleged prototype

8     of JFax?

9          MR. CARROLL:  I believe so.

10          THE COURT:  Does it self-authent -- does it

11     self-explain itself in any way?  Would you know what the

12     importance of it was standing by itself?

13          MR. CARROLL:  I would.

14          THE COURT:  I can't read it.  You know, the print

15     is too fine.  It's --

16          MR. CARROLL:  Sure.

17          THE COURT:  It's like 2. print.

18          MR. CARROLL:  Your Honor, I -- I absolutely believe

19     it would have the context, because what we're essentially

20     talking about here is that j2 pursued patent applications in

21     '97 and '98, and it had its own system, JFax which was on

22     sale and in the public marketplace and it related to fax

23     technology.  They admittedly did not turn that material over

24     to the patent office in connection with its patent

25     applications.

```
 1              We claim that was wrongful on their part and it
 2     violated their duty of candor.  The patents that underwent a
 3     substantial re-examination process in about 2005, that lasted
 4     for years.  They not only did not turn the information over
 5     when they had the second opportunity to do so --
 6              THE COURT:  When did your firm become aware of
 7     Dr. Faber's possible importance to the -- the issues here?
 8              MR. CARROLL:  In the summer of 2010.
 9              THE COURT:  And how did it become aware?
10              MR. CARROLL:  Mr. Bellows, an associate at King &
11     Spalding reviewed the document production; communicated to
12     his superiors who communicated with my partner, Mr. Carmody.
13     And at that point, Mr. London of King & Spalding, Mr. Carmody
14     of -- of my team spent significant time amending
15     strategies --
16              THE COURT:  How do we know that they weren't
17     alerted by Mr. Findley to focus on Dr. Farber?
18              MR. CARROLL:  Because Mr. Findley had no
19     involvement with Open Text at that time.  This is 18 -- 12 to
20     18 months before Findley, his name is ever known to me or
21     anyone on my team.  Now that jFax system -- another reason
22     why this is so important, Your Honor, is because j2, as you
23     may recall, was involved with significant litigation with
24     other parties several years ago.  They issued a notice of
25     legal hold.  They had re-examination proceedings in place
```

1    with the patent office.  Not only did they not turn over this

2    Farber testing data and evidence of Farber's public testing

3    of it, they also didn't turn over their own system -- the

4    source code and the documentation associated with it.  And we

5    learned from a 30(b)(6) designee of j2 that they actually

6    destroyed that source code and the related --

7            THE COURT:  What does that have do with what we're

8    discussing?

9            MR. CARROLL:  Well, they're -- I believe what

10   they're claiming, Your Honor, is that our ability to bringing

11   the claims or spoliation of evidence and inequitable conduct

12   were not -- were learned not through our hard work and not

13   through the due course of discovery, but from Mr. Findley,

14   which is erroneous.  The facts are clear; that never

15   happened.  We were onto this, long before we ever heard the

16   name of Clyde Findley -- long before.

17           THE COURT:  Where is Mr. Findley now?  He works in

18   D.C.?

19           MR. CARROLL:  He works in the D.C. office of

20   Crowell & Moring.

21           And, Your Honor, when this issue first came out, I

22   instructed everyone on my team to terminate any

23   communications with Mr. Findley; spoke with the client, told

24   them that under the circumstances, I think the wise thing to

25   do here until we know more, is to cease using him on any

```
 1    matters.  It did.

 2            You know, even though Crowell wasn't co-counsel;

 3    even though Crowell wasn't litigating the litigation strategy

 4    or wasn't working with us in a close way, they voluntarily

 5    said, you know, We disagree.  We don't believe there was a

 6    conflict of interest.  We ran through our internal

 7    conflicts -- you know, I mean Crowell & Moring is a very

 8    well-established reputable firm.  They don't have really any

 9    conflicts' proceedings --

10            THE COURT:  And they put Mr. Findley on a j2

11    matter?

12            MR. CARROLL:  As I understand it, yes, Your Honor.

13    But in any event, you know, the drastic step that j2 is

14    seeking here, to have Open Text's longtime counsel who has

15    history to these cases --

16            THE COURT:  It would be useful if Mr. Findley was

17    here so we could ask him some questions.

18            MR. CARROLL:  Your Honor, I did not understand that

19    today would -- would be an evidentiary --

20            THE COURT:  It wasn't, but I was just thinking

21    about it.

22            MR. CARROLL:  But we can have him here at

23    Your Honor's pleasure.  I would -- from my perspective,

24    Your Honor, Mr. Sacks told me this too in one of our

25    conversations about this.  He knows I did not nothing wrong.
```

```
 1   He's told me I did nothing wrong.  My team did nothing wrong.
 2   He's told me that much.  We didn't learn of any confidential
 3   information.  We don't have any information from Mr. Findley
 4   about j2; not just confidential but any.
 5          He was a low-level associate at the time who was
 6   working, as I understand it, on public searches related to
 7   prior art.
 8          THE COURT:  Who knows.  Who knows.  That can be the
 9   most dangerous situation.  People can say things that they
10   may not even understand the importance of, you know.
11          MR. CARROLL:  But that presumes that he would have
12   said something.  And, Your Honor, he did not disclose
13   information to me or members of my team.
14          THE COURT:  Well, the problem is directly or
15   indirectly.  I certainly accept your representations.  Let me
16   hear from Mr. Sacks.
17          MR. SACKS:  Well, let me give you some -- just the
18   perspective of this from j2's standpoint, Your Honor, on how
19   we look at it...
20          At some time last year, unknown to us, Open Text
21   knowingly hired j2's former lawyer -- the person who spent
22   235 hours working on these very same patent infringement
23   claims while he was at Kenyon & Kenyon.  Opened -- Crowell &
24   Moring has said they knew he worked for j2.  They then
25   assigned him to work for Open Text.  They haven't told us
```

```
 1   whether they told Open Text he previously worked for j2.  I
 2   can only assume they did since they haven't denied that they
 3   did.  Moreover, it is inconceivable to me that when he was
 4   asked to work on the very same patents that he had worked on
 5   at Kenyon & Kenyon somehow during eight and a half or nine
 6   months of conversations, it didn't come out, Oh, I'm familiar
 7   with these patents from when I was at Kenyon & Kenyon.  It's
 8   almost inconceivable; but unknown to us they hired our
 9   lawyer.  They didn't tell us about it.  They didn't ask us
10   for a conflict waiver.
11        During that period of time until we knew about it,
12   by their own admission, this lawyer had regular
13   communications with in-house lawyers at Open Text about this
14   case.  He had communications in e-mails, in meetings --
15        THE COURT:  They had other -- they had in-house
16   lawyers but not one that had IP expertise?
17        MR. SACKS:  I don't know, Your Honor, because they
18   haven't given us any information.  What I have is limited to
19   what's in the letters that have been produced to me; but what
20   has been indicated is that he was communicating with the
21   lawyers in-house at Open Text responsible for this case;
22   whether that's the general counsel or another lawyer, I don't
23   know the answer to that.  That's not information that we're
24   privy to.  But we do know that he was communicating with
25   those people.  We also know that he was communicating with
```

1    Perkins Coie about this case.

2           Now, I'm not in a position to -- to counter Mr. --

3    Mr. Carroll's representations.  In all disqualification

4    cases, the answer is they didn't tell me anything that was

5    useful.  Whether it was inadvertent, whether it was

6    unintentional, whatever it was that Mr. Findley said was

7    necessarily informed by his prior work for j2.  And you can't

8    take that.  That's why there's a rule against representing an

9    adverse party in a substantially related matter.  But in that

10   period, he met with Perkins Coie in person and on the

11   telephone, at meetings at which the strategy in this case was

12   discussed.  What he contributed versus Mr. Carroll or others,

13   I don't know.

14          He also met in person with King & Spalding who was

15   at the time directing the EasyLink defense in a joint

16   arrangement with Mr. Carroll.  They've all been here before

17   Your Honor.  They're all working together; but at that

18   time -- and indeed, he -- Open Text had him meet with

19   King & Spalding to discuss the strategy of defending the

20   EasyLink cases after the deposition at which he appeared and

21   after who he -- Mr. Bernstein said on the record, "This man

22   used to work for Kenyon & Kenyon on j2 matters."  After that

23   event, Open Text had him meet with King & Spalding to discuss

24   the strategy and the EasyLink case.  So it wasn't this

25   immediate, Oh, my goodness, we made a mistake.  Let's

```
 1    withdraw.  They continued this process --

 2              THE COURT:  Well -- oh, okay.  But how does that

 3    relates to Perkins Coie's knowledge of it --

 4              MR. SACKS:  Because they're all talking to one

 5    another, Your Honor.  They're now defending that case, the

 6    strategy of defending -- again, you talk about who said what

 7    to whom.  The strategy of defending the EasyLink cases, it's

 8    all Perkins Coie today.  It's all the same client today.

 9    They've all spoken to one another today with Mr. Findley's

10    involvement.

11              Your Honor, Mr. Findley's not -- involvement came

12    to our knowledge not by -- and by the way, I should point

13    out, Mr. Findley is noted on our privilege logs.  We have

14    documents produced to Perkins Coie in this case that identify

15    Mr. Findley as a lawyer at Kenyon & Kenyon working on this

16    matter on our privilege log.

17              THE COURT:  Okay.  They say that that's false.

18              MS. MATTHAI:  Your Honor, if I may...

19              THE COURT:  You can stay there.  That's fine.

20              MS. MATTHAI:  The difference --

21              The CLERK:  Could we have you at the microphone.

22              MS. MATTHAI:  Sure.  There is a privilege log.

23    Mr. Findley's name is on the privilege log three quarters of

24    the way through.  There is a cover letter with that privilege

25    log that identifies the lawyers that are contained within the
```

1   privilege log, and Mr. Findley's name is not identified as a

2   lawyer.  There is --

3           THE COURT:  His name is listed on the privilege log

4   but not on the index?

5           MS. MATTHAI:  No.  There was a listing of who -- in

6   other words, there was a listing with a privilege log that

7   says, "The following people on the privilege log are

8   lawyers."  And there's a list of names.  Mr. Findley's name

9   was not on that list of lawyers.  So there was no way to look

10  at that privilege log months -- you know, long, long, long

11  before any of these issues came up and have any idea that

12  Mr. Findley was, in fact, a lawyer.

13          THE COURT:  Well, how does his name appear then?

14          MS. MATTHAI:  It's just listed as having

15  communications.  It's just one of the names in the -- in

16  their -- how many listings on the privilege log?

17          MR. CARROLL:  Your Honor, I believe there are 875.

18  And the first time I have ever reviewed the privilege log was

19  in connection with the motion brought by j2.  It was directed

20  to Mr. Carmody.  Mr. Carmody has assured me that he never

21  looked through the privilege log at the time.

22          THE REPORTER:  I'm sorry.  Can you speak into the

23  mic.

24          MR. CARROLL:  I'm sorry.  Yes.

25          Mr. Carmody has assured me that neither -- he never

```
 1    looked at the privilege log.  He gave it to our secretary to
 2    put in the file somewhere.  And we have -- we've never
 3    challenged an assertion of privilege by j2, nor have they
 4    ever challenged one of our assertions of privilege.  It's
 5    been in a rather contentious set of cases.  It's been one
 6    issue the parties have never made an issue out of.  They
 7    designated something that's privileged, fine.  We move on.
 8    So, you know, the notion that we had notice that Mr. Findley
 9    had worked for them by way of that, is -- is incorrect.  But
10    more importantly, we asked in discovery -- we asked in
11    interrogatories who has ever worked on these patents -- these
12    reexamination proceedings.  We asked them to disclose that
13    information.  They never disclosed Clyde Findley.  If they
14    had, then I could have been in a position where I could have
15    actually used that information to say, Ah, he shouldn't work
16    on this matter.  But they didn't -- they didn't answer that
17    in a fulsome way.  In addition, Dr. Farber -- going back to
18    him, he was disclosed in an interrogatory answer that j2
19    gave.  And that all happened long before Clyde Findley's name
20    was ever known to me or anybody on my team.
21              MR. SACKS:  My only point, Your Honor, is
22    Mr. Findley was identified on the log and was identified as
23    being at Kenyon & Kenyon on the log.  I am not necessarily
24    ascribing blame to anybody, simply that he was on the log as
25    a lawyer at Kenyon & Kenyon.
```

```
1            The point, Your Honor -- I mean, they knew he had
2     worked at Kenyon.  And they, not Perkins Coie but "they"
3     being Crowell & Moring, when they assigned him to work on
4     this matter --
5            THE COURT:  Yeah.  It's inexcusable.  I don't
6     understand how that could happen.  So -- I don't understand
7     that.  So, you know --
8            MS. MATTHAI:  Your Honor --
9            THE COURT:  Yes?
10           MS. MATTHAI:  Thank you.  I appreciate it.  This is
11    a vicarious disqualification issue --
12           THE COURT:  I understand.
13           MS. MATTHAI:  -- obviously.  But I wasn't
14    suggesting not.  But the point was that what has been filed
15    with the Court is a motion.  What the Court does not have the
16    benefit of at this point is the opposition to the motion with
17    all of these details that we're discussing here.
18           THE COURT:  I know.
19           MS. MATTHAI:  There -- there's a -- there's a great
20    need for evidence on this, I believe.  And it -- it would
21    be -- it would seem appropriate that the people who have the
22    actual knowledge should be before the Court by declaration
23    and/or in person, so the Court can be satisfied whether there
24    is or is not a problem here.
25           THE COURT:  Well, I mean, I had this -- wanted you
```

```
 1    to come for the status conference, I didn't want this to turn

 2    into World War III.  And I thought it would be important to

 3    try to get some handle on it before you deposited large

 4    quantities of documents with me.  So -- and just reading it

 5    over, I thought, Well, the person that probably should be

 6    testifying under oath is Mr. Findley, so that I can have some

 7    sense of the vicarious liability issue.  And beyond that, I

 8    don't have any other suggestions, other than I'd like to see

 9    it resolved without it turning into something that it doesn't

10    need to turn into; that's all.  That's my suggestion at this

11    point.

12              MR. CARROLL:  Your Honor, if I may...

13              THE COURT:  Go ahead.

14              MR. CARROLL:  There was an assertion made that

15    Open Text hired Mr. Findley to perform in this capacity with

16    knowing intent that he had previously done work for j2.  When

17    I -- when I disclosed this issue -- my knowledge of it to the

18    folks at Open Text, they told me they were wholly unaware of

19    it; that they didn't know of it.

20              So the notion -- again --

21              THE COURT:  Well, that's an important issue,

22    obviously, because there could be repercussions for Open Text

23    if they knowingly hired prior counsel and didn't disclose it

24    to anybody.

25              MR. CARROLL:  Well, Your Honor, I think as
```

```
 1    Ms. Matthai has suggested -- and the point I was trying to

 2    make earlier when I was addressing Your Honor's statement

 3    that I might be a victim in this whole thing was, I have no

 4    issues coming forward with the evidence in this case, either

 5    my testimony, Mr. Findley's testimony -- I think it should

 6    all be -- these are serious issues.  I've had the press

 7    contact me in the past weak or so.  I've had the manager, the

 8    partner to my firm, the head of my litigation group -- the

 9    intimation here is that I did something wrong and that my

10    firm did something wrong.  And we didn't.  And, you know, I

11    believe, Your Honor, that if you hear the testimony from

12    Mr. Findley, if you hear the testimony from Mr. Parker and

13    Mr. Davies at Open Text, if you hear the testimony from the

14    people in my firm, you'll be satisfied that -- that -- first

15    and foremost, I seriously doubt that a junior associate who

16    is doing Google searches to look and see whether there was

17    prior art had access to --

18            THE COURT:  I don't know whether any of that is

19    true.  And I don't know what he listened to; I don't know

20    whether he heard another partner go, Oh, my gosh, I'm really

21    worried about this issue.

22            MR. CARROLL:  Uh-huh.

23            THE COURT:  This is our Achilles heel.  I don't

24    know whether any of those conversations took place.  But, you

25    know, it's just disappointing that we're here.  And I'm
```

1    certainly not intending to create the impression that you or

2    anyone from your firm did anything wrong.

3              MR. CARROLL:  Well, but, Your Honor, we -- it's a

4    motion to disqualify.  This is an -- the court:

5              THE COURT:  I understand that.

6              MR. CARROLL:  We had to hire a special ethics

7    counsel to come in and represent us on this matter.

8              THE COURT:  I know.  One can be a victim without

9    doing anything wrong.

10             MR. CARROLL:  But just given the gravity of the

11   circumstances and the substantial prejudice that would result

12   for my client, if somehow we're removed from this case or

13   there are either penalties that --

14             THE COURT:  But what if your client knowingly took

15   advantage of this situation and -- and hired Mr. Findley.  It

16   doesn't -- you know, without your knowledge.  That 's a

17   serious issue for your client.

18             MR. CARROLL:  That's why I think it's appropriate

19   for them to come in here and tell Your Honor directly that

20   they had no knowledge.  And -- and all I'm asking for,

21   Your Honor, is the opportunity to have evidence and the

22   people who have knowledge of these issues come before you.

23             THE COURT:  That's fine.  How do we do that in an

24   efficient way?  What should we do?

25             I think Mr. Findley should come and testify.  And

```
1    you can make his -- you can bring him here.  Is that what you
2    said?
3              MR. CARROLL:  I can make that happen.
4              THE COURT:  You can make that happen.  Not bring
5    him here, but you can coordinate that.
6              MR. CARROLL:  Yes.
7              THE COURT:  Yeah.
8              MR. CARROLL:  I'll bring my clients here; I'll
9    bring my colleagues here.  We'll give you declarations
10   under oaths as officers of this Court.  And -- and, Your
11   Honor, we're -- we're happy to do that.
12             THE COURT:  Okay.
13             MR. CARROLL:  I would like the opportunity to file
14   an opposition brief.  I -- in -- in -- you know, Your Honor,
15   I hear -- I adhere to the comment that you made that you
16   don't want this turning into World War III.
17             THE COURT:  I don't.
18             MR. CARROLL:  And, however, the brief that was
19   proffered is not based on supported facts.  And Mr. Bernstein
20   submits an affidavit about what Mr. Findley did at
21   Kenyon & Kenyon.  Mr. Bernstein wasn't even with the Kenyon
22   firm at the time.  You joined in May 2005, I understand.
23             MR. BERNSTEIN:  May I, Your Honor?
24             THE COURT:  Yeah.
25             Mr. BERNSTEIN:  I joined Kenyon in January 2005,
```

```
 1   Tim, while Mr. Findley was there.  And I saw his name on
 2   directories on the -- on an internal drive at Kenyon.
 3             MR. SACKS:  Your Honor, we have the time records of
 4   what Mr. Findley did.  And we've offered to give them to you
 5   in camera if you would like.
 6             THE COURT:  Well, you've represented generally the
 7   scope of the things that he's worked on.
 8             Correct.  And -- and --
 9             THE COURT:  I mean, I don't know whether he worked
10   on things that were material.  I don't know whether he had
11   heard information that should not have been communicated to
12   anyone else.  I don't know that.  But I know that he had no
13   business than working in an adverse situation for another
14   firm, representing j2's adversary.  I know that.
15             MR. SACKS:  I'll give you one example, Your Honor.
16             THE CLERK:  Bring the mic to you.
17             MR. SACKS:  I'll give you one example, Your Honor.
18   Mr. Farber -- we're not contending Mr. Farber's name and
19   existence couldn't be known to Mr. Findley.  But this is when
20   he appeared at a deposition in this case the first time at
21   Mr. Farber's deposition.  Mr. Findley was involved in a memo
22   while at -- working at -- for j2 at Kenyon & Kenyon where the
23   import of Mr. Farber's potential testimony on our claims was
24   discussed.
25             What could be more directly material to this case
```

```
 1   where they are now claiming invalidity based upon those very

 2   facts?

 3               THE COURT:  Well, what's the remedy then if that's

 4   true?

 5               MR. SACKS:  The remedy is disqualification of them.

 6   In this particular case --

 7               THE COURT:  Well, the client already has all that

 8   knowledge.

 9               MR. SACKS:  Well, the knowledge of Mr. Farber.  But

10   that's why, Your Honor, we've suggested that you need to find

11   out whether there are in-house lawyers who have been tainted

12   by Mr. Findley and need to be walled off.

13               I -- again, I've never been involved in a

14   situation -- I'm not blaming Mr. Carroll.  I mean, I don't

15   throw these accusations around lightly.

16               Again, look at my client's position.  Their lawyer

17   shows up on the other side.  I'm not saying Mr. Carroll did

18   it intentionally.  I don't know whether he did or didn't

19   know.  I -- but that's not the test of cutting out the cancer

20   for this purpose.  We are the ones --

21               THE COURT:  How is the cancer cut out at all in

22   this case if you have the client that allegedly, you know, is

23   now privy to some information that may be of tactical

24   significance?

25               MR. SACKS:  You don't allow the lawyers who are
```

1    privy to that to participate in the evaluation of this, in

2    oversight of this case.

3           THE COURT:  Well, if the principals of the firm --

4    of the client are already aware of it --

5           MR. SACKS:  I don't know what they're aware of.

6    Again, Your Honor --

7           THE COURT:  I don't know either.  I'm

8    speculating --

9           MR. SACKS:  You maybe -- well, in an egregious case

10   if it was done with knowledge, you might enter terminating

11   sanctions; but assuming that's not the case here, Your Honor,

12   what you would potentially do is do the best you can to

13   protect us.  And the one thing you would do to protect us is

14   to remove counsel who was regularly communicating with this

15   man during that period of time.

16          THE COURT:  Well, isn't the -- isn't the rabbit out

17   of the hat already on all of these issues?

18          MR. SACKS:  Now then, Your Honor -- then the answer

19   will be no harm, no foul --

20          THE COURT:  Let's just be practical.  Isn't

21   whatever damage may or may not have been done, hasn't it been

22   done?

23          MR. SACKS:  I don't know, Your Honor, because -- I

24   don't know, because what has been said to the lawyers here

25   about ways to look at issues -- the ways they are looking at

```
 1    issues now and approaching those issues may well be formed in

 2    part by Mr. Findley's interactive discussion with them.

 3            THE COURT:  I tend to think that that's less

 4    likely.  I tend to think that his involvement on that level

 5    is probably not that significant.  Whether he could have

 6    communicated some -- some issue of concern that your client

 7    might have that might give them an advantage in a settlement

 8    negotiation or in the lawsuit, I don't know.  Those are

 9    certainly concerns.

10            MR. SACKS:  They've indicated he was directly

11    involved in preparing Open Text with -- with Perkins Coie for

12    the mediation that did not happen last -- last May.  So I

13    mean, he has been involved --

14            MR. CARROLL:  Can I address that point, Your Honor?

15            THE COURT:  Go ahead.

16            Did you have -- have you ever had a mediation in

17    this matter?

18            MR. CARROLL:  Just two weeks ago we did, Your

19    Honor.

20            MR. SACKS:  We had one two weeks ago.  The one that

21    he was involved in preparing for, did not happen.

22            MR. CARROLL:  It was cancelled by Mr. Sacks after

23    the Open Text acquisition of EasyLink was announced.  And

24    that was set for mid July in San Francisco with Judge Walker,

25    but we did recommence settlement talks; had a mediation
```

```
 1    roughly two weeks ago.  It was not fruitful, unfortunately.
 2    But he suggested that Mr. Findley was directly involved in
 3    the mediation preparation, making it seem like Mr. Findley
 4    had some role in it.  What happened was -- and I was in
 5    Washington -- well, we drafted the mediation statement.  What
 6    we had agreed to was to submit a short pithy presentation and
 7    not try to over-lawyer the mediation session.  So each side
 8    would submit a 10, 12-page high-level overview of its
 9    position of the case and that we would skip the lawyering
10    aspect of the mediation and try to have the business
11    discussion.  So we wrote a high-level, here are our defenses;
12    here's why we think we win; here's why we think the patents
13    are invalid, et cetera; but, nonetheless, we look forward to
14    a meaningful discussion with Judge Walker.  I had sent that
15    to the client -- that brief for review, Let me know if you
16    have any comments, changes, et cetera.  If not we're going to
17    serve it on Judge Walker in advance of the mediation, as I
18    agreed to with Mr. -- with Mr. Sacks.
19         Mr. Findley did receive a copy of the mediation
20    statement.  The day before we were to submit it, he wrote an
21    e-mail to me and said, Here are my comments for what they're
22    worth.  Nice job, or something to that effect.
23         I did not incorporate any of his comments nor was I
24    instructed to incorporate his comments nor was I required to
25    take direction from him.  It was, Change a comma here.  This
```

```
 1   word -- I don't understand what you mean with this word.  I

 2   didn't incorporate those comments, Your Honor.

 3           So the strategy associated with the mediation, the

 4   meetings, the issue of settlement authority, what positions

 5   we're going to put forward were all done independently --

 6           THE COURT:  But he was involved enough to -- at a

 7   level to be able to feel that it was appropriate for him to

 8   comment on your settlement position -- your confidential

 9   settlement position?

10           MR. CARROLL:  He had access to it, yes.

11           What motivated him or what he did, I don't know.

12   You know, what he did --

13           THE COURT:  Well, had he continued up until that

14   time to be the -- the outside point person for Open Text?

15           MR. CARROLL:  Your Honor, he was never the point

16   person --

17           THE COURT:  I mean -- well, he was -- he was an --

18   in effect, you said earlier on loan to Open Text from Crowell

19   to help coordinate IP litigation; right?

20           MR. CARROLL:  IP issues --

21           THE COURT:  IP issues.

22           MR. CARROLL:  -- things along those lines.

23           THE COURT:  Sure.  Issues.  Were things filtered

24   through him when you had a need to communicate issues to

25   Open Text?
```

```
 1            MR. CARROLL:  As I mentioned earlier, Your Honor,
 2    that in some cases when they needed help getting someone to
 3    help us locate documents or for scheduling depositions and
 4    things along those lines --
 5            THE COURT:  He was administrative assistant only?
 6    That's what you're telling me.
 7            MR. CARROLL:  Your Honor, he did not have, in my
 8    view, a substantive role in our strategies, in our approach
 9    to this litigation.  And in, in fact, Your Honor --
10            THE COURT:  How senior is he?
11            MR. CARROLL:  He's a -- about ten years out of law
12    school.  Your Honor, I think there's one other important fact
13    point that I was in Madison, Wisconsin in February taking a
14    deposition in an unrelated case.  I got an e-mail from the
15    client -- and I don't want to waive privilege here; but it
16    relates to this issue.  And I'd like to reserve my rights to
17    assert privilege at a later point; but the client called me
18    and indicated that EasyLink was up for sale and they were
19    going to consider it.  And they asked me if we could provide
20    some assistance in connection with the IP due diligence in
21    the matter, the team, et cetera.  And I asked them, because
22    it was confidential, who knows, and who I could tell.  And
23    they told me, "The only person you can tell in your team is
24    Mr. Carmody.  There are only three or four people here who
25    know.  Does Mr. Findley know?  No, he does not."  That series
```

```
1    of negotiations took place over several months and the deal

2    was announced ultimately in July of last year.

3              As I understand it, Mr. Findley was not brought

4    over the wall so to speak, on the deal -- I mean, he wasn't a

5    vibrant, deciding person within the Open Text legal

6    department --

7              THE COURT:  Maybe he wasn't involved in deals.

8    Maybe he was involved in more the litigation prosecution

9    side.  I don't know.

10             MR. CARROLL:  I don't know either; but, you know,

11   the key issue that I keep coming back to is -- is that,

12   did -- you know, even if he had confidential information,

13   which I don't think has been established, but even if he did,

14   did he communicate it to us?  And he did not.

15             And we have it -- you know, you asked the question

16   about, Is the rabbit out of the hat already.  Well, you know,

17   there's no -- one of the factors here is, what prejudice does

18   j2 sustain as a result of this, even assuming worst case

19   scenario, and he was a bad actor and he disclosed stuff; but

20   all this information is public.  And it's public because

21   these are patent-related matters.  j2 has made the

22   affirmative decision to seek patents and be involved in

23   public proceedings with the patent office and with these

24   litigation matters about its patent history, it's patent

25   rights, its purported inventions.  And when they made that
```

```
 1   decision, everything that we're talking about today, these
 2   are public issues.
 3          And, Your Honor, we're at a point in the case where
 4   we've produced probably close to a million pages.  They've
 5   produced millions of pages of documents.  We've had 50, 60
 6   maybe more depositions in the case.  All that happened, claim
 7   construction hearings well before Findley got involved.  It's
 8   just -- we're so late in the game, and there's no prejudice
 9   to j2 that the drastic remedy that they're seeking only harms
10   my client.
11          THE COURT:  When did he get involved with -- with
12   Open Text or EasyLink business when he was at Crowell?
13          MR. CARROLL:  I believe it was in January of this
14   year.  Yeah, I mean maybe a few weeks before -- I mean, maybe
15   a few weeks before.  I don't have an affirmative --
16          MR. SACKS:  Fourth quarter of 2011 is what we've
17   been told in the correspondence that has been sent to us,
18   Your Honor.
19          THE COURT:  Okay.
20          Well, okay.
21          Okay.  Well, by that time he had been away from
22   Kenyon for --
23          MR. CARROLL:  About seven years.
24          THE COURT:  Well, five years -- five and a half,
25   six years maybe.
```

44

1           MR. CARROLL:  He left in --

2           THE COURT:  2005.

3           MR. CARROLL:  Early 2005, as I understand it.

4           THE COURT:  I don't know if it was early, but he

5    left in 2005.  So we're dealing with five or six years.

6    Maybe -- maybe a little more, plus or minus.

7           MR. CARROLL:  I -- about six years.

8           THE COURT:  Does that make sense?  Yeah.

9           MR. CARROLL:  Yeah, exactly, Your Honor.

10          Now, the -- the -- another important point,

11   Your Honor, is that those cases -- or those matters that he

12   worked on several years ago at Kenyon are unrelated to this

13   case.  The systems that are accused of infringement here are

14   different -- different products, different theories of

15   infringement.  The invalidity positions that we're asserting

16   are new.  They weren't used -- and those were other

17   companies, other lawyers, other decisions.  And in my view,

18   they're unrelated to it.

19          And, Your Honor, notably, one of the primary -- and

20   Mr. Sacks' in the brief asserts that we are relying on the

21   same invalidity positions today as what was looked upon by

22   the defendants in the *Callwave* and *Venali* litigations back in

23   '04 and '05.  And that's not correct.

24          The prior art we're relying on in our effort to

25   invalidate these patents are the systems that were

1    commercialized by Open Text which is called RightFax.  The

2    product that was commercialized by EasyLink BMS and the other

3    product that was commercialized by EasyLink called XDDS,

4    those prior -- you know, cards on the table, we are going to

5    wheel those systems into the courtroom for the trial and show

6    those systems and how they operated; how they were for sale

7    in the public domain years before the patent applications

8    were filed.  Those systems were not used, relied on, and to

9    my knowledge even known by the lawyers who represented *Venali*

10   and Callwave back in 2004, 2005.

11           Your Honor, there's another issue too here that I

12   think merits some attention.  You may recall -- obviously,

13   there's been a lot of turnover and changes in these cases.

14   You may recall at one time we had defendants who were

15   involved in the first Markman proceeding: Protus IP

16   Solutions; there was another called Packetel; there was

17   another company called Venali.  I represented Protus.  I

18   represented Packetel.  And I represented actually another

19   defendant called Zilker Ventures which was subject to a j2

20   lawsuit in an induced infringement case.

21           So my history with j2, these patents is even

22   independent of Open Text.  I have extensive familiarity with

23   the inventors, the people -- the people who are involved in

24   the industry going back years all independent of Open Text

25   and certainly independent of Mr. Findley; but, you know,

1    those companies were members of a joint defense agreement

2    with my client Open Text.  Mr. Sacks' client, j2 has acquired

3    those companies.  And those people, as I understand it, are

4    now working for j2, including Joseph Nour, who is the CEO of

5    Protus, who after the acquisition -- well, actually, he never

6    told me that the acquisition was underway.  Afterward, he

7    told me, "We shouldn't talk anymore.  I now work for j2."

8             So those people who had access to our confidential

9    joint defense communications are in their fold.  These -- I

10   mean, these allegations they're drastic and they're off-base.

11   You know, it's -- we don't --

12            THE COURT:  In this case they're drastic and

13   off-base when you have a lawyer -- I don't want to repeat it.

14   We're not talking about the same thing.  You think these are

15   off base and drastic allegations that Mr. Sacks had no

16   business raising?

17            MR. CARROLL:  I think as to me and my firm and what

18   we knew and or didn't know -- as to us, yes.  I don't -- you

19   know, we did not learn of confidential information.

20            THE COURT:  Okay.

21            MR. SACKS:  Can I just one raise one thing,

22   Your Honor?

23            Let me just describe for you what Crowell & Moring,

24   again who didn't answer most of our questions when I asked

25   things like, How many times did you meet with this person or

```
 1    that person, they wouldn't give me -- I didn't ask for the
 2    content; but how many.  They wouldn't give me that, but they
 3    say -- this is how they describe what Mr. Findley was doing.
 4    He followed Perkins Coie's litigation work and provided his
 5    comments thereon to Open Text in-house counsel together with
 6    reports on the progress of the litigation.  After j2 proposed
 7    that the parties mediate their dispute, Mr. Findley assisted
 8    Open Text with preparation for the mediation that was to have
 9    occurred in May of 2012.
10            So I mean they do describe him as being directly
11    involved.  And if we are going to have a hearing on this
12    issue at some point, I do think that there should be
13    disclosure of how many times Mr. Findley met with in-house
14    people at Open Text and with whom and when and how many times
15    he met with people or spoke to people at Perkins Coie and
16    when and who, and the same thing with King & Spalding, so we
17    have an understanding of the -- not getting into the
18    substance.  I mean, they're -- again, we're having denial,
19    denial, denial.  And I realize the tension here, and I
20    realize the difficult and sensitive situation that we're in;
21    but that's why I think California law applies these
22    presumptions rather than getting into that.  But I do think
23    that in order to properly assess this, it would be helpful to
24    know during what period and how many times and with whom he
25    met or spoke regarding anything relating to the j2
```

```
1    litigation.

2            MS. MATTHAI:  May I just briefly, Your Honor?

3            THE COURT:  Uh-huh.

4            MS. MATTHAI:  I believe this point may already be

5    clear, but I think it's critical.  And so I wanted to

6    reiterate it.  And that is that my client Perkins Coie had

7    absolutely no knowledge whatsoever that Mr. Findley had ever

8    had any relationship with j2.

9            It is also my understanding that my client's

10   client, Open Text did not know that Mr. Findley had ever had

11   any relationship with j2.  I -- I certainly understand this

12   Court's unhappiness --

13           THE COURT:  And when did it learn -- when did your

14   client learn of this?

15           MS. MATTHAI:  When Mr. Findley went to the Farber

16   deposition, one of the counsel identified him at that point

17   as someone who had previously worked for Kenyon & Kenyon.

18   That was the first time that my client had ever heard that

19   Mr. Findley had ever had any relationship with j2.  And at

20   that point, all contact was cut off.

21           So the -- we have a situation here where

22   Mr. Findley unbeknownst to either Open Text or Perkins Coie,

23   got assigned to his role.  And now there's an attempt to

24   disqualify Perkins Coie when it did not receive any

25   information from Mr. Findley that was, in fact --
```

```
 1              THE COURT:  What is Mr. Findley doing now?  What's
 2    his current status?
 3              MS. MATTHAI:  You know what?  I'm going to have to
 4    turn to someone else to answer that question; I'm not sure.
 5              THE COURT:  Okay.
 6              MR. CARROLL:  Your Honor, I do not know.  We've had
 7    no communication with Mr. Findley since the phone call I had
 8    with him following the Farber deposition.
 9              THE COURT:  He's not doing any work at all for
10    Open Text --
11              MR. CARROLL:  No, sir.
12              THE COURT:  -- or EasyLink?
13              MR. CARROLL:  Not one hour, nothing.
14              And Crowell & Moring has no role in any of these
15    litigations.
16              THE COURT:  Okay.  Well, let me just think out loud
17    with you all a little bit.  I mean, we could have Mr. Findley
18    come here.  I would put him under oath.  You could ask him
19    questions.  And I would suspect that he would be motivated to
20    tell the truth on all those issues -- all these issues under
21    oath.  It also seems to me that whatever information he may
22    have communicated, you know, has already been communicated.
23    He doesn't represent an ongoing threat.  So you're dealing
24    with, Well, what did he communicate possibly in the past that
25    may have been of strategic value or some other value.  I
```

1    don't know the answer to that question.  One can make the

2    argument, Things were public knowledge or they were readily

3    ascertainable, but based on my experience, not everyone

4    appreciates the significance of things that may be public

5    knowledge, and not everyone appreciates how a -- a party may

6    overvalue its own weaknesses and how those -- those issues

7    may be of value to another side.  So you just never know in

8    this whole process, you know -- the true value of

9    information.  It's difficult to know.

10          So, you know, I would be very concerned if

11   Open Text or EasyLink had access to confidential information

12   that was -- that they wouldn't otherwise have access to

13   because of, you know, the arrangement with Crowell.  You

14   know, at this point, they already have access to that

15   information.  I -- you know, I'm not sure that there's a

16   whole lot more to be gained by going through privilege logs

17   and all of that other information.  I think we'll still end

18   up with concerns and -- and -- and anxiety about the whole

19   thing.  I'm not inclined at this point to be leaning towards

20   requiring Perkins Coie to withdraw.  It certainly doesn't

21   seem to have been any -- the firm doesn't seem in any way to

22   have been a knowing or deliberate participant in any of

23   these -- these occurrences.  And it certainly wouldn't make

24   sense for it to do that, especially given all of the -- I'm

25   sure millions of dollars that have been spent, independent of

1    anything that has to do with Mr. Findley.

2              On the other hand, I understand Mr. Sacks' concern

3    on this whole issue.  Sort of putting it all in the context

4    of Mr. Findley of being away from Kenyon for five or

5    six years before he started re-entering this world, you know,

6    it seems sort of less likely at this point that he

7    communicated something that would really be of value.  But I

8    don't know that for a fact.

9              So it seemed to me that perhaps the only middle

10   ground that made sense at this point is just simply to have

11   him come and you can ask him questions.  And if it looks like

12   additional information may be required, then we can go from

13   there.  But those are my thoughts, Mr. Sacks.

14             MR. SACKS:  Very well.  We'd like the opportunity

15   to question Mr. Findley.  I would say, Your Honor, on the

16   point about not being inclined at the moment at least to

17   order the disqualification and --

18             THE COURT:  Well, they haven't had adequate

19   opportunity to respond anyway.

20             MR. SACKS:  Oh, sure.  I wasn't expecting you to

21   disqualify them today.

22             THE COURT:  No, of course not.

23             MR. SACKS:  But to the extent that's where you're

24   leaning, I would only stress as you pointed out, one will

25   never know what Mr. Findley did or didn't disclose.  And as

1    between my client which is the victim of this and their

2    client which took advantage of them, the chips ought to fall

3    in favor of my client.  And their client has a remedy against

4    Mr. Findley --

5              THE COURT:  Well, their client hypothetically may

6    have taken advantage of him, but there's no information that

7    Perkins Coie took advantage of him.  And that's -- you know,

8    I sort of come back to, you know -- to that issue in terms of

9    remedies.

10              MR. SACKS:  Well, there's no knowledge that Perkins

11    Coie, at least at the moment knowingly took advantage of it.

12    Whether they were privy to information without even knowing

13    that it was formulated as part of it, one will never know.

14              THE COURT:  What -- what good would it do to

15    disqualify Perkins Coie?  So that the client who already has

16    the information would then hire another law firm?

17              MR. SACKS:  So that we are at least being -- being

18    in litigation with somebody who is not tainted by access to

19    our former lawyer.  I mean, that is why this rule does exist.

20              THE COURT:  Yes.

21              MR. SACKS:  And if you --

22              THE COURT:  And if the client -- the principal

23    already has that information, that rule doesn't have any

24    effect on this case, particularly when you have a -- you

25    know, you have what we have here.

```
1          MR. SACKS:  I appreciate Your Honor is looking at
2    this pragmatically in light of the size of this litigation
3    and the period of time it's been going on; but I would urge
4    you when we ultimately get to the evidence and look at it, to
5    look at it from the perspective of the reason for the
6    rigidity of this rule and the issue of looking at this on a
7    sort of case-by-case weighing basis where you are encouraging
8    people to push the envelope.  Whether Perkins Coie did or
9    didn't know is not really the ultimate issue in this case.
10   The issue is what has happened, whether there has been
11   exposure.  I mean, nobody -- I mean, the letters that have
12   come back have -- again, you heard it today, suggest --
13          THE COURT:  But these cases all -- you know, the
14   cases that -- that I've dealt with, dealing with conflicts
15   like this, they deal with the sort of continuing threat of
16   future harm.
17          MR. SACKS:  Not -- the two leading cases in
18   California which have set forth this rule, neither of them
19   dealt with the continuing threat or future harm, Your Honor.
20   But both Flat and Pound, the two cases that deal with the
21   vicarious disqualification rules in California, neither of
22   them did.  And both of them were --
23          THE COURT:  But did they deal with -- did they deal
24   with the vicarious disqualification issue that we're faced
25   with today?
```

Exhibit 1, Page 55

 1          MR. SACKS:  Yes.  *Pound* does precisely, not even

 2    within the same firm -- a firm that was an associated firm.

 3    And they disqualified the associated lawyer based upon a

 4    15-minute phone conversation four years earlier.  And they

 5    adopt a very rigid view which is, if it's substantially

 6    related and you were exposed, we're not going to get into he

 7    said/she said, that's the end of it.  We're not going to get

 8    into a weighing of this.  You were exposed; we will never

 9    know what you were exposed to.  The rule is firm.  And in

10    this state which is the applicable in this court, you do it

11    based upon presumption.  So again, I'm not --

12          THE COURT:  I'm not going to -- that's fine.

13          MR. SACKS:  I'm not asking you --

14          THE COURT:  I understand your points.

15          MR. SACKS:  I'm not asking to you decide today.

16    But I do think that having an opportunity to find out from

17    Mr. Findley what he did --

18          THE COURT:  Well, let's do that.  When should we do

19    that?

20          MR. CARROLL:  Your Honor, we'll be as prompt as we

21    possibly can.  I would suggest maybe that we get some dates

22    from Mr. Chambers.

23          THE CLERK:  I have some dates ready next week.  One

24    will be the following week.  Other than that, I don't know if

25    we're in trial.

```
1              THE COURT:  How about next week, John?

2              THE CLERK:  We can do it next Wednesday or next

3    Thursday or the following Tuesday.

4              THE COURT:  Thursday is probably better.  Wednesday

5    is --

6              THE CLERK:  We start at 10:00.  I have an afternoon

7    calendar.

8              MR. SACKS:  So next -- it would be

9    November the 1st?

10             THE CLERK:  Correct.  At 10:00 a.m.

11             THE COURT:  Yes.

12             MS. MATTHAI:  I actually have two problems on that

13   day.  One is that I have an airplane ticket to Hawaii;

14   perhaps more problematical is that I'm actually in trial in

15   Orange County.  And I'm going to have to head there from

16   here.  And it is anticipated that our jury will have the case

17   on Monday afternoon.  They may or may not have a verdict by

18   Thursday.

19             THE COURT:  Well, Okay.  I'm not sure what your

20   schedule is.  You've started the trial?

21             MS. MATTHAI:  We closed evidence yesterday.  And

22   we're doing closing argument on Monday.  We're doing closing

23   argument next Monday, and it will go to the jury at that

24   point in time.

25             THE COURT:  I see.  What if we make it on Wednesday
```

 1   then.  You won't have a trip to Hawaii planned.  And you'll

 2   be not too far away, and if you had an issue -- are you

 3   trying the case?

 4          MS. MATTHAI:  Yeah, I'm sole trial counsel.  I can

 5   ask the Court for -- it's Judge Colaw who's very

 6   accommodating which is why he went dark this morning.  I can

 7   ask Judge Colaw if I can have a member of my office there if

 8   the jury is still out on Wednesday with me on call.  The one

 9   thing that that would mean is that I would have to be

10   available if there was an issue that came up, like a question

11   for the jury.

12          THE COURT:  Yeah, that's fine.  Let's do that.

13          MR. SACKS:  Your Honor, I have an 8:30 hearing in

14   family law Court in the courts.  And I have a 2 o'clock

15   conference in CCW on Wednesday of next week.

16          THE COURT:  Well --

17          MR. SACKS:  I don't know.

18          MR. CARROLL:  Your Honor --

19          THE COURT:  What's CCW?

20          MR. SACKS:  You know, Civil West, the complex --

21   the state Court complex; sorry.

22          THE COURT:  What do you have at 2 o'clock there?

23          MR. SACKS:  We have an initial conference in front

24   of a new judge who was just assigned to the case.

25          THE COURT:  Okay.  What's the following week then,

```
 1    John?  When are you getting back from Hawaii?

 2              MS. MATTHAI:  Oh, it's a very quick trip.

 3              THE COURT:  Oh, it's very short.

 4              MS. MATTHAI:  It's basically over the weekend.

 5              THE COURT:  What's the following week then?

 6              THE CLERK:  Just that I do know that we won't be in

 7    trial the week of November 5th.  So that leaves, Tuesday,

 8    November 6th available.  The Court is not available the 7th

 9    or the 8th.

10              MR. CARROLL:  We can make that work, Your Honor.

11              MS. MATTHAI:  Of course, no one has talked to

12    Mr. Findley, but certainly from our side, unless he were

13    unavailable, that would work.

14              THE COURT:  How about that, Mr. Sacks?

15              MR. SACKS:  I was supposed to do a deposition, but

16    I'll make it work, Your Honor.

17              THE COURT:  Okay.  So we'll do that 10 o'clock

18    then.

19              MR. SACKS:  Your Honor, what are we doing with --

20    we have three motions that were scheduled -- this, which has

21    been noticed for the 19th.  And they have two motions that

22    they filed.  They're not directly related to this, but we've

23    asked that they be put off until this issue is decided.  Are

24    we going to keep the 19th as the hearing date on this motion?

25    Can we put the other two off for a week or two until this
```

58

```
1    motion is decided?  What do you want to do with the --

2              THE COURT:  I don't know what they all are.

3    There's some spoliation motions and --

4              MR. SACKS:  We're going to be producing the

5    documents to them that they're claiming have been destroyed

6    and spoiled.

7              THE COURT:  Why don't you do that beforehand so we

8    don't need to deal with it.  I would probably want to deal

9    with all the motions the same date, unless there is some

10   other reason why we couldn't do that.

11             MR. SACKS:  Should we put them off then, given that

12   you want to hear evidence on this or --

13             THE COURT:  Evidence on -- are you talking about

14   this current motion?

15             MR. SACKS:  Yes.

16             THE COURT:  We're just going to have Mr. Findley

17   here.  I don't think I need any other evidence.  You know, to

18   the extent you want to produce additional documents prior to

19   the hearing that you think would be helpful, that's fine.

20   I'll leave it up to you.

21             MR. SACKS:  Certainly.

22             MR. CARROLL:  Your Honor, I think right now we have

23   a motion to amend the counterclaims, which I would expect to

24   be granted in due course; but we're forced to file a motion

25   on that point.  We also have a motion for sanctions on the
```

```
 1   spoliation issue.  Oral argument has been set for the
 2   disqualification issue and for the motion to amend issue for
 3   November 19th.  The -- the -- the motion for sanctions was
 4   noticed out as a matter of course for November 12th which
 5   happens to be veterans day, and the Court is closed that day.
 6   A new hearing date has not yet been assigned for that sole
 7   motion.  I would suggest that we keep the hearing date on the
 8   19th and use that as an opportunity to present our respective
 9   positions on the motion to amend, the motion for spoliation.
10   And to the extent that there is anything left over from the
11   disqualification issue that we presented at that time.
12              THE COURT:  That's fine.  Just move everything to
13   the 19th, but we'll have the hearing on whatever the date
14   was.
15              MR. CARROLL:  November the 6th, election day, I
16   believe.
17              THE CLERK:  Your Honor, that is election day.
18              THE COURT:  Yeah, I know.  So what's -- what's --
19   yeah, I know.
20              THE CLERK:  Sorry.
21              MR. CARROLL:  So November 6th at 10:00 a.m.
22              THE COURT:  Correct.  And, you know, I'm -- you
23   know, to the extent that further briefing might be necessary,
24   then I would give you certainly time after that and we could
25   have the hearing on that issue down the road.
```

```
1                MR. CARROLL:  That makes sense --

2                THE COURT:  Does that make sense to you?

3                MR. SACKS:  It does, Your Honor.  I guess I would

4     ask one other question.  I don't know what their opposition

5     is going to be, but if I'm going to be getting a bunch of --

6     I don't know whether it matters -- but if I'm going to be

7     getting a bunch of self-serving declarations or

8     uncorroborated I spoke to Mr. Findley, but he never told me

9     anything, I'm not -- if we're only taking testimony from

10    Mr. Findley, I mean, I don't know that they can have it both

11    ways.  They're, in essence, saying what didn't occur during

12    substantive conversations.  I'm not -- I'm not sure how to

13    deal with that issue, because I get the sense that I'm going

14    to hear from Mr. Carroll and Mr. Carmody, some in-house

15    person, and you're going to get a litany of two-page

16    declarations that are going to say, I didn't know anything.

17               MR. CARROLL:  We will all be here on November 6th,

18    Your Honor.

19               THE COURT:  That's fine.  That's fine.

20               MR. SACKS:  Okay.

21               THE COURT:  You're worried about getting something

22    and not having an opportunity to respond to it.

23               MR. SACKS:  Correct or basically not having any

24    ability to respond because I can't question these people and

25    they've refused to give me any of the information --
```

```
 1              THE COURT:  I mean, I guess the way I was looking

 2    at it, is I didn't sort of want to turn it into -- you know,

 3    a more substantial hearing.  I thought it would be wise just

 4    to hear from Mr. Findley.  And then we can go from there.

 5    I'm not really interested in additional declarations or other

 6    evidence that you might want to submit.  We'll see what

 7    Mr. Findley says.  And in light of that, we can see where we

 8    go.

 9              MR. CARROLL:  Your Honor, would it be appropriate

10    for -- would it be appropriate for us to file our opposition

11    brief to the motion to disqualify in advance of that hearing?

12              THE COURT:  Sure.  Sure.  That would be fine.

13              MR. CARROLL:  Okay.  Are you -- are you -- does

14    that make sense?

15              MR. Sacks:  No.  I think that makes perfect sense.

16              THE COURT:  Does that make sense?

17              MR. CARROLL:  Mr. Sacks and I can work that out.

18              THE COURT:  Okay.

19              MR. CARROLL:  Thank you for your time, Your Honor.

20              MR. SACKS:  And, Your Honor, I hope you won't have

21    to hear the spoliation motion because they're going to

22    they're going to get the code that they say was spoiled.

23              THE COURT:  Okay.

24              THE CLERK:  And, Your Honor, procedurally, this

25    will be an evidentiary hearing?
```

1          THE COURT:  Yes, it will.

2          THE CLERK:  Okay.  Thank you.

3             (Whereupon the proceedings adjourned.)

4                        -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4

 5    j2 GLOBAL COMMUNICATIONS, INC.      :

 6              vs.                       :  No. CV 09-04189-DDP

 7    EASYLINK SERVICES INTERNATIONAL     :  No. CV 11-04239-DDP

 8    CORPORATION                            No. CV 09-04150-DDP

 9

10

11    I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

12    UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

13    CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

14    TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

15    CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

16    PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

17    TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

18    OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

19    FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

20    REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

21    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

22

23    /S/_____          10/26/2012

24    MARIA R. BUSTILLOS                    DATE
      OFFICIAL REPORTER
25
```